## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| RAE ROBINSON and KELLY FOSTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| OPPENHEIMERFUNDS, INC., | ) | |
| a Colorado Corporation, and | ) | |
| OPPENHEIMERFUNDS DISTRIBUTOR, | ) | |
| INC., a New York Corporation. | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Rae Robinson and Kelly Foster, by and through their attorneys, Stoltmann Law Offices, P.C., bring this Complaint at law against defendants OppenheimerFunds, Inc., and OppenheimerFunds Distributor, Inc., and state as follows:

### Parties

1. Plaintiff Rae Robinson (hereinafter "Mrs. Robinson" or "Plaintiff") is an individual who at all times relevant resided in Salt Lake City, Utah.  Mrs. Robinson is currently 86 years old.  As of the date of the filing of this complaint, Mrs. Robinson intends to remain in Utah indefinitely and is domiciled in the State of Utah.

2. Plaintiff Kelly Foster (hereinafter "Ms. Foster" or "Plaintiff") is an individual who at all times relevant resided in Bountiful, Utah.  Ms. Foster is Mrs. Robinson's daughter.  As of the date of the filing of this complaint, Ms. Foster intends to remain in Utah indefinitely and is domiciled in the State of Utah.

3. Defendant OppenheimerFunds, Inc. (hereinafter "Defendant" or "OFI") is a Colorado corporation with its principal place of business at 2 World Financial Center, 225 Liberty

Street, 11th Floor in New York, New York.  OFI was the manager and investment advisor of the Oppenheimer High Income Fund/VA (hereinafter the "Fund" or the "High Income Fund") and handled the day-to-day management of the Fund at all times relevant.  OFI earned a fee for its management of the Fund.

4.  Defendant OppenheimerFunds Distributors, Inc. (hereinafter "Defendant" or "OFDI") is a New York corporation with its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor in New York, New York.  OFDI is a subsidiary of OFI and was the principal underwriter and distributor of the High Income Fund at all times relevant.  OFDI and OFI are sometimes collectively referred to as "Oppenheimer."

## Jurisdiction and Venue

5.  Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the Defendants maintain offices in this district, did business in this district, sold investment products in this district, and the misleading materials at issue were believed to be prepared and drafted in this district.

6.  Plaintiffs are domiciled in the State of Utah and are citizens of the State of Utah.

7.  Defendant OFI has its principal place of business in the State of New York, is incorporated under the laws of the State of Colorado, and is therefore a citizen of the States of New York and Colorado.  Defendant OFDI has its principal place of business in the State of New York, is incorporated under the laws of the State of New York, and is therefore a citizen of the State of New York.

8.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the plaintiffs and all defendants, and the amount in controversy exceeds $75,000.

**Fact Common to All Counts**

9.    The Oppenheimer High Income Fund/VA is an open-ended management investment company registered with the Securities and Exchange Commission.  The only way to purchase this Fund was to invest in it through a subaccount of a variable life insurance policy or variable annuity.

10.    The Fund has no employees.  Instead, it is managed by an investment manager (in this case, OFI) under a management contract that is approved by the Fund's Board of Trustees.  In return, OFI provided employees to act as the Fund's officers and manage the fund.

11.    OFI is responsible for making all day-to-day investment decisions for the Fund, including decisions as to what assets the Fund will investment in.

12.    OFDI is the principal underwriter and distributor of the Fund's shares.  OFDI typically has selling arrangements with life insurance and annuity companies who provide the High Income Fund as an investment option for subaccounts of an insurance policy or annuity.  Thus, if the insurance or annuity company has an arrangement with OFDI to sell the High Income Fund within the policy or annuity subaccounts, then an investor who holds such a policy or annuity can invest in this Fund.  OFDI helped draft the public offering and registration documents and other marketing materials sent to the investing public.

13.    The Fund was essentially supposed to be a "clone fund" of the Oppenheimer Champion Income Fund.  Because clients could not invest in the Champion Income Fund through their life insurance policy or variable annuities, the High Income Fund was created for variable life insurance or annuity investors to replicate the performance and investment

strategy of the Champion Income Fund by investing in a similar portfolio of underlying investments as the Champion Income Fund did.  Investors who wanted to invest the Champion Income Fund within their variable life policies or annuities could then invest in the High Income Fund.

14.  While the High Income Fund is technically separate and distinct from the Champion Income Fund, the High Income Fund employed the same strategy as the Champion Income Fund and attempted to invest in similar securities as the Champion Income Fund.

15.  The High Income Fund employed Angelo Manioudakis as its portfolio manager, who also managed the Champion Income Fund and was employed by OFI and OFDI.  Angelo Manioudakis headed the team of OFI employees that made these day-to-day decisions for the High Income Fund.  Upon information and belief, Manioudakis was a Vice-President of OFI.  Manioudakis took over the day-to-day management of the Fund in late 2006 and was responsible for the Fund's management until his termination in December 2008.

16.  Upon information and belief, OFDI has a selling arrangement with GE Life and Annuity Company (now known as Genworth Financial) to sell the Fund to investors through its life insurance products, including the Flexible Premium Variable Life Insurance Policy.

17.  Both of the Plaintiffs purchased shares of the High Income Fund through their GE Flexible Premium Variable Life Policies.  The Plaintiffs purchased their variable life insurance policies through their advisor, Jay Jensen, who operates his office in Salt Lake City.

18.  Mr. Jensen recommended that the Plaintiffs invest in the High Income Fund.  When he made the recommendation to the Plaintiffs to purchase these shares, he relied upon information that was given to him from OFI and OFDI.  Mr. Jensen communicated to the

Plaintiffs in general terms that he believed the High Income Fund was relatively safe.

19.     Each of the Plaintiffs relied upon the information that was given to them by Mr. Jensen

when deciding to invest in the High Income Fund.  The Plaintiffs believed that this Fund

was relatively safe, generated income, and that it had the normal risks associated with a

typical high yield bond fund.  However, the Plaintiffs were not aware of the extreme risk

that the High Income Fund was taking on.

20.     Much like the Champion Income Fund, OFI and OFDI substantially misrepresented the

highly speculative nature of the High Income Fund.  The risks of this Fund were

materially misrepresented to the investing public, including the Plaintiffs.

21.     Moreover, Manioudakis, as agent for OFI and OFDI, mismanaged the High Income

Fund.  He did not invest the Fund's assets in a safe, prudent manner and recklessly made

the Fund very risky.

22.     Manioudakis also exceeded the parameters of the Fund as outlined in the Fund's

prospectus and Statement of Additional Information when he concentrated the underlying

assets of the Fund in the mortgage industry, and when he used more leverage in the Fund

than was allowed.

23.     In 2008, the value of the Fund's shares dropped approximately 80 percent, with

staggering losses of nearly 56 percent in the month of November 2008 alone.  This

matched the same performance (and losses) as the Champion Income Fund.  As the value

of these shares fell, so did the value of the Plaintiffs' investment in the Fund.

24.     The High Income Fund was portrayed by the Defendants as a relatively safe bond mutual

fund that did not involve "undue risk."  For example, the April 2008 prospectus states:

> What Is the Fund's Investment Objective?  The Fund's objective is to seek a high

level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), **believes does not involve undue risk**.

                        * * *

How Do the Portfolio Managers Decide What Securities to Buy or Sell?  In selecting securities for the Fund, the overall strategy is to build a **broadly diversified portfolio to help moderate the special risk of investing in high-yield debt instruments**.  The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends.  They evaluate an issuer's liquidity, financial strength and earnings power.  The Fund's portfolio managers also analyze the overall investment opportunities and risks in different market sectors, industries and countries.  The Fund's portfolio managers consider some or all of the factors below (which may change over time):

> o Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
> o Issuers with improvements in relative cash flows and liquidity to help them meet their obligations,
> o Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
> o Changes in the business cycle that might affect corporate profits, and
> o Securities or sectors that will help the overall diversification of the portfolio.

The portfolio managers monitor changes in the factors listed above.  Any changes may trigger a decision to sell a security.

See April 2008 Prospectus (emphasis added).

25.     While the Fund's Prospectus did state that "past investment performance is not necessarily an indication of how the Fund will perform in the future", the Fund's Prospectus was intended to lead investors to believe that the risks of this Fund were not substantial.  The Fund's Prospectus stated:

    The Fund's Past Performance

    **The bar chart and table below show one measure of the risks of investing in the Fund, by showing changes in the Fund's performance for Non-Service Shares from year to year for the last ten calendar years and by showing how**

**the average annual total returns of the Fund's shares** compare to those of a broad-based market index.  Because the Fund's Service Shares and Class 4 shares are subject to a service fee, their performance is expected to be lower for any given period.  Because Class 3 and Class 4 shares were recently made available, a full calendar year of performance information is not yet available.  The Fund's past investment performance is not necessarily an indication of how the Fund will perform in the future.

[The appendix of the Prospectus then contained the following table with the High Income Fund's annual returns:]

| Calendar Year Ended | Annual Total Returns |
| --- | --- |
| 12/31/98 | 0.31% |
| 12/31/99 | 4.29% |
| 12/31/00 | -3.74% |
| 12/31/01 | 1.97% |
| 12/31/02 | -2.40% |
| 12/31/03 | 23.96% |
| 12/31/04 | 8.97% |
| 12/31/05 | 2.31% |
| 12/31/06 | 9.42% |
| 12/31/07 | -0.10% |

See April 2008 Prospectus (emphasis added).  As one can see, the worst year that this Fund suffered prior to 2008 was a return of negative 3.74%.  It is clear that this chart was inserted in the Prospectus to lead investors to believe that this was not a risky or volatile Fund.

26.     Similar representations were made in the prospectuses as far back as 2001 and up through and including 2008.   The prospectuses make no disclosures that this Fund was

dramatically riskier than the peer group of high yield bond mutual funds.

27.     The Defendants portrayed the High Income Fund and the Champion Income Fund to be conservative or safe bond funds.  As an example, other conservative Oppenheimer funds held substantial positions in the Champion Income Fund.  As of December 31, 2007, the Oppenheimer Conservative Investor Fund had approximately 11% of its internal holdings invested in the Champion Income Fund.

28.     OFI and OFDI portrayed high-yield fixed-income mutual funds to be relatively safe to the investing public.  For example, in an Oppenheimer brochure entitled "Saving for Retirement: How to Make the Most of Your Company's Plan" dated February 21, 2005, Oppenheimer compared high-yield fixed-income mutual funds to other equity-based mutual funds.  This article is attached hereto and incorporated by reference as **Exhibit 1**. Page 13 of this article presents a chart showing the relative degrees of risk in a mutual fund – from cash as being the most conservative to global and international equity mutual funds being the most aggressive and riskiest mutual funds.  The chart shows that Oppenheimer considers high-yield fixed-income mutual funds to be less aggressive and more conservative than any equity mutual funds.

29.     The High Income Fund was anything but safe, and any representations to the contrary made by the Defendants were false.

30.     The Defendants failed to accurately represent the risks and characteristics of the High Income Fund and misled investors, including the Plaintiffs.

31.     The representations made by the Defendants were false and misleading for a number of reasons:

        a)      The Fund pursued risky trading strategies beginning in late 2006 and through

2008 when Manioudakis started concentrating the Fund's assets in speculative mortgage-backed securities and derivative investments;

b)       The Fund's strategy created an undue amount of risk and did not adequately disclose the illiquid nature of these derivatives and mortgage-backed securities;

c)       The Fund failed to disclose the extent to which the assets in the Fund were exposed to leverage, thereby increasing the risk;

d)       The Fund failed to disclose the risks related to concentrating the Fund's assets in one particular industry or in one type of investment;

e)       The Fund exceeded the allowable amount of "illiquid" or "restricted" securities that the Fund could invest in; and

f)       The Fund did not identify the tranches of the derivatives being purchased by the Fund and failed to address the significantly different risks and characteristics of lower-level tranches as compared to higher-level tranches.

32.     The Fund's new trading strategy beginning at the end of 2006 and continuing through the end of 2008 gambled on these derivatives and mortgage-backed securities, but the Defendants failed to adequately inform investors of this new strategy.  The Defendants failed to inform the Plaintiffs and other investors that this new trading strategy was dramatically riskier than those previously used.

33.     As part of this new strategy, the Fund began investing in total-return swaps (or "TRS"). Total-return swaps are highly illiquid, speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities performs. Specifically, the Fund was betting that top-rated commercial mortgage-backed securities would rally in 2008. The Fund gambled on these total-return swaps and lost.

34.     In addition to investing in total-return swaps as part of this new trading strategy, the High Income Fund was also concentrated in credit-default swaps ("CDSs"). CDSs are similar to insurance contracts that protect investors against bond and loan defaults (or other specified credit events like bankruptcy or restructuring). In exchange for being responsible to pay out for such issues, CDS sellers receive a stream of interest payments from the CDS buyers.  It is not necessary for the buyer to own the underlying credit instrument to buy these CDSs.

35.     Selling CDSs is extremely risky and speculative when insuring companies that are already struggling with credit problems.  The risks of these CDSs were well known to the Fund managers prior to the Fund meltdown occurring, but the extent of this risk was not adequately disclosed to the Plaintiffs.

36.     While the High Income Fund can invest in derivatives, the Fund took a massive bet in some of the riskiest derivative tranches available. Instead of providing specific detailed risk disclosures, the Fund provided nothing more than boilerplate legal jargon which most of the investing public cannot utilize to adequately comprehend the substantial risks of this Fund.

37.     The use of derivatives added leverage to the Fund because it allowed the Fund to bet on more securities than they actually held in the portfolio. This exacerbated losses when the Fund was already declining. The actual risks of the Fund made it much more similar to a hedge fund than the conservative high income fund it was portrayed to clients in offering and marketing materials.

38.     Like the Champion Income Fund, the High Income Fund also increased its gamble on falling mortgage related bonds in 2008.  As defaults continued to rise, the mortgage

related holdings plummeted. While this sort of sector bet might be appropriate for a sector fund or hedge fund, the High Income Fund was not meant to be a sector or hedge fund and was represented to investors as an appropriate investment for conservative investors.

39.     Pursuant to the parameters of the Fund as set forth in its prospectus and Statement of Additional Information, the Fund was allowed to borrow money up to 33.3% in excess of the total value of its assets.  However, the Fund exceeded this amount and was over-leveraged.  "Leverage" refers to the use of borrowed money in an effort to increase the Fund's returns; however, with a potential in this increased return also comes increased risk.  The credit default swaps, total return swaps, and derivatives that the Fund invested in were also leveraged.

40.     This increased leverage meant that the Fund took on substantially more risk than what was allowed.  When the value of the leveraged assets within the Fund dropped, this exacerbated the losses.

41.     For example, it is believed that the Fund had approximately $402 million in net assets in June 2008.  It is also believed that the Fund had used considerable leverage through the use of these derivatives, more than the 33.3% that was allowed.

42.     Similarly, the Fund was allowed to invest up to 25% of its assets in one industry. However, with the use of the credit default swaps and total returns swaps, it is believed that the Fund had a huge over-concentration in the mortgage industry, well above this 25% amount.  Again, Manioudakis invested the assets of the Fund beyond what was allowed.

43.     Likewise, the Fund was allowed to invest up to 10% of its assets in "illiquid" or "restricted" securities – securities which have no active trading market, making it difficult to dispose of them promptly or at an acceptable price, especially during adverse market conditions.   Manioudakis invested the Fund's assets in illiquid or restricted securities beyond this 10% threshold, in violation of the Prospectus and Statement of Additional Information.

44.     The Defendants are likely to argue that the 2008 subprime mortgage collapse affected the market as a whole.   However, a comparison of the High Income Fund to aggregate bond indices shows how horrific the High Income Fund's performance was.   The High Income Fund dropped about 80% during 2008 while the Barclays' Aggregate Bond Index actually gained about 5% for the year.   As such, Oppenheimer cannot claim that it was primarily market events that caused this collapse – instead, it was the high concentration in the CDSs and mortgage related securities that seriously hurt this Fund and turned it into a *de facto* hedge fund or a subprime mortgage sector fund.

45.     The Securities and Exchange Commission ("SEC") investigated OFI and OFDI for their handling of the Oppenheimer Champion Income Fund and another fund, the Core Bond Fund.   The SEC's Order dated June 6, 2012 is attached hereto and incorporate by reference as **Exhibit 2**[1].   The SEC alleged:

> The Funds' underperformance was driven primarily by their exposure to AAA-rated commercial mortgage-backed securities ("CMBS"). They obtained that exposure mainly through derivative instruments known as total return swaps ("TRS contracts"), which created substantial leverage in both Funds.

---

1.  The Order was entered by the SEC pursuant to a settlement with OFI and OFDI in which OFI and OFDI agreed to pay over $35 million to settle claims with the SEC.  Footnote 1 of the Order states that the findings made pursuant to the Order are not binding on any other person or entity or on any other proceeding.  However, the SEC's allegations are relevant to the present matter and mirror many of the Plaintiffs' allegations here.

* * *

In addition, throughout 2008, Respondents sold shares of the Champion Income Fund under a prospectus that highlighted the fund's cash investments in junk bonds without adequately disclosing the fund's practice of assuming substantial leverage through its use of derivatives. By offering and selling Champion Income shares under a misleading prospectus and making misleading statements in the midst of the Funds' steep declines in late 2008, Respondents violated the federal securities laws, as set forth below.

See Exhibit 2 at ¶¶ 1, 3.

46.     The SEC described how the use of the swaps greatly increased the leverage of the Champion Income Fund, in excess of what was allowed pursuant to the Champion Fund's prospectus:

Rather than investing directly in CMBS [mortgage-backed securities], however, the Core Plus Team [of OFI] increased the Funds' CMBS exposure mainly by entering into TRS contracts with various counterparties…Put simply, the Funds took a "long" position in CMBS (anticipating that CMBS spreads would tighten), while the counterparties on the contracts took a "short" position (anticipating that spreads would widen).
* * *
Unlike purchases of actual CMBS, these TRS contracts required no initial commitment of cash; the Funds had to "pay" for their CMBS exposure only to the extent that CMBS spreads moved against their positions. This allowed the Funds to take on large amounts of CMBS exposure without having to liquidate other positions, but it also caused them to take on leverage by adding market exposure on top of the assets on their balance sheets. By March 31, 2008, Champion had net assets of approximately $2 billion, but, through its TRS contracts, it had additional exposure to approximately $1 billion of CMBS that it did not actually own.
* * *
As the value of the Funds' assets fell, the notional amounts of their TRS contracts remained constant, meaning that their *relative* exposure to CMBS (as compared to other fixed income sectors) actually increased. This was especially true in Champion. By mid-October 2008, Champion's net assets had fallen to approximately $1 billion, about half the fund's size in March. But the fund *still* had approximately $1 billion worth of additional CMBS exposure through TRS contracts, meaning that CMBS represented a far larger position for the fund, relative to other sectors, than it had six months earlier, even though the notional size of the position had not changed.

See Exhibit 2 at ¶¶ 8-11.

47.     The SEC further alleged how this use of TRS violated the Champion Fund's internal risks

policies and the subsequent choice by management to bring the Champion Fund within

compliance of those policies, at which point the Champion Fund sold assets at distressed

prices and ultimately caused the Champion Fund's value to plummet:

> In late 2008, the combination of increased CMBS volatility and heightened
> CMBS exposure caused both Funds' risk levels (as measured by OFI) to exceed
> certain limits set forth in OFI's internal risk management guidelines…On or about
> November 12, however, OFI senior management directed the Core Plus Team to
> bring the Funds back into compliance with the firm's internal risk management
> guidelines.
> * * *
> The Core Plus Team began executing its CMBS risk-reduction plan immediately,
> entering into hedging positions that offset a portion of the Funds' exposure on
> November 14. Just as the team began attempting to trim risk, however, the CMBS
> market's collapse accelerated over the course of the following week, creating
> staggering liabilities for Champion…on their TRS contracts and driving their
> NAVs still lower. In the eight days between November 12 and November 20,
> 2008, Champion's NAV fell approximately 60%...

See Exhibit 2 at ¶¶ 13-14.

48.     The SEC alleged that the Champion Fund's prospectus failed to adequately disclose that

investors would be subject to such substantial leverage.  See Exhibit 2 at ¶ 25.  The SEC

further alleged that the prospectus "did not adequately disclose that Champion could use

derivatives to such an extent that the fund's total investment exposure could far exceed

the value of its portfolio securities and its investment returns could depend primarily

upon the performance of bonds that it did not own."  Exhibit 2 at ¶ 25.  The prospectus

also failed to adequately convey the heightened risk of loss associated with the use of

such leverage.  Exhibit 2 at ¶ 25.  The SEC concluded that the prospectus violated

securities laws by making materially misleading statements.  Exhibit 2 at ¶ 27.

49.     Again, while the Plaintiffs here did not invest in the Champion Income Fund, they invested in a "clone" fund which replicated the characteristics and performance of the Champion Income Fund.  Thus, their investment in the High Income Fund subjected them to the same risks as the Champion Income Fund, which ultimately caused the Plaintiffs' significant losses.

*Mrs. Robinson's Investments*

50.     Mrs. Robinson purchased her variable life insurance policy on or about September 28, 2000, and she funded it with a premium payment of $491,555.95.

51.     On or about December 15, 2000, she invested all of the money in the variable life policy sub-accounts (at that time it was $480,803.55) in the Oppenheimer High Income Fund. The returns from the variable life policy sub-accounts were used to pay the policy's annual expenses, up until about 2008.

52.     Mrs. Robinson's variable policy suffered immensely during the Fund's collapse in late 2008.  The sub-account value of Mrs. Robinson's life insurance policy went from $470,793.03 on September 28, 2008 down to $135,393.35 on November 28, 2008.  Thus, in two months, Mrs. Robinson lost over $335,000 in her variable life policy sub-accounts.

53.     Unfortunately, as the value of Mrs. Robinson's sub-accounts fell due to the decline of the High Income Fund, so did the returns from her sub-accounts.  This has resulted in the policy's expenses eating into the value of her sub-accounts further.

54.     Moreover, Mrs. Robinson's variable life policy only sends annual statements, in early October of each year.  As a result, Mrs. Robinson could not have known that she suffered losses in November 2008 until she received her annual statement in October 2009.

*Ms. Foster's Investments*

55.    Ms. Foster purchased her variable life insurance policy on or about October 19, 2000, and she funded it with a premium payment of $97,797.24.   While Ms. Foster owned the policy and paid the premium, the insured on the policy was Rae Robinson, Ms. Foster's mother.

56.    On or about December 15, 2000, she invested all of the money in the variable life policy sub-accounts (at that time it was $95,010.11) in the Oppenheimer High Income Fund. Like Mrs. Robinson's policy, the returns from Ms. Foster's variable life policy sub-accounts were used to pay the policy's annual expenses, up until about 2008.

57.    Ms. Foster's variable policy also suffered immensely during the Fund's collapse in late 2008.  The sub-account value of Ms. Foster's life insurance policy went from $74,370.26 on August 19, 2008 down to $15,813.15 on December 19, 2008.   Thus, in about four months, Ms. Foster lost about $50,000 in her variable life policy sub-accounts.

58.    Unfortunately, like Mrs. Robinson's policy, as the value of Ms. Foster's sub-accounts fell due to the decline of the High Income Fund, so did the returns from her sub-accounts. This has resulted in the policy's expenses eating into the value of her sub-accounts further.  As of September 2011, the value of her sub-accounts has fallen to about $4,600.

59.    Moreover, Mrs. Robinson's variable life policy only sends annual statements, in late October of each year.  As a result, Ms. Foster could not have known that she suffered losses in November 2008 until she received her annual statement in October 2009.

60.    Based on the information provided by Oppenheimer and its agents, the Plaintiffs reasonably relied on this information and were unaware that there was substantial risk in the High Income Fund.

## COUNT I – Colorado Consumer Protection Act

(All Plaintiffs v. All Defendants)

61.    The Plaintiffs restate and reallege paragraphs 1 through 60 as though fully stated herein

as paragraph 61.

62.    At all times material herein, there existed in the State of Colorado, a statute entitled the

Consumer Protection Act ("CPA"), C.R.S. § 6-1-101 et seq, which provides that it is

unlawful to:

(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
***
(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;
***
(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

C.R.S. § 6-1-105 (2008)

63.    Defendants used deception, false promises, and misrepresentations to hide the full risks

of the High Income Fund.

64.    Moreover, the Defendants invested the Funds' assets outside of the permissible

parameters of the Fund by investing too much in illiquid or restricted securities, by

investing too much in one industry, and by investing with too much leverage.  This also

constitutes deceptive or unfair practices in violation of the Consumer Protection Act.

65.    Defendants intentionally and fraudulently concealed that the level of risk and speculative

nature of the derivatives and mortgage backed securities in which the High Income Fund

was concentrated in.

66.     This deceptive practices were made in the course of the Defendants' business, which is to manage, sell, and distribute financial products like the High Income Fund.

67.     The losses in the High Income Fund not only affected the Plaintiffs, but it affected thousands of other investors.  This deceptive practice significantly impacted the public as actual consumers of the Defendants' products and services.

68.     The false and fraudulent statements regarding the risks and characteristics of the High Income Fund constituted a deceptive act or practice pursuant to the Consumer Fraud Act.

69.     The aforesaid course of conduct of the Defendants arose out the Plaintiffs' dealings with Defendants in pursuit of financial security, and as such, was involved in trade or commerce.

70.     It was the intention of the Defendants that the Plaintiffs rely on these false statements and representations.

71.     As a direct and proximate result of Defendants' fraudulent course of conduct, the Plaintiffs suffered financial damage in an amount in excess of $400,000 plus loss of interest.

WHEREFORE, the Plaintiffs pray for judgment against the Defendants for:

a.   actual damages, pursuant to C.R.S. § 6-1-113;

b.   treble damages, pursuant to C.R.S. § 6-1-113;

c.   attorney fees, pursuant to C.R.S. § 6-1-113;

d.   reasonable costs, pursuant to C.R.S. § 6-1-113: and

e.   such other and further remedy that the Court deems just and equitable.

## COUNT II - Common Law Fraud
(All Plaintiffs v. All Defendants)

72.  The Plaintiffs restate and reallege paragraphs 1 through 71 as though fully stated herein as paragraph 72.

73.  The Defendants misrepresented the level of risk associated with the High Income Fund by portraying the Fund as not having "undue risk" and by representing that it would have a "broadly diversified portfolio to help moderate the special risk of investing in high-yield debt instruments".

74.  In fact, the Fund was extraordinarily risky and lost approximately 80% of its value in less than one year.

75.  The Defendants knew the aforesaid statements were false at the time they were made to Plaintiffs.

76.  The Defendants made the false statements with the intent to induce the Plaintiffs to invest money in the High Income Fund and to keep the money invested in the Fund as the Fund took on excessive risk.

77.  The Plaintiffs relied on the truth of the statements made by Defendants when they invested in the Fund and stayed invested in the Fund throughout 2008 as the Fund collapsed.

78.  As a result of the reliance on the aforesaid false statements, the Plaintiffs suffered financial loss.

79.  Furthermore, Defendants conduct was willful and malicious and a violation of trust and confidence.

WHEREFORE, the Plaintiffs pray for judgment against the defendants for:

a.      actual damages;

b.      attorney fees;

c.      reasonable costs; and

d.      any other remedy that the Court deems just and equitable.

**COUNT III – Negligent Misrepresentation**
(All Plaintiffs v. All Defendants)

80.    The Plaintiffs restate and reallege paragraphs 1 through 79 as though fully stated herein as paragraph 80.

81.    The Defendants are in the business of supplying information in that they provide information (albeit, incomplete and misleading information) to investors to make decisions about the funds that they are purchasing.

82.    The Defendants had a duty to supply accurate information to the Plaintiffs about the risks and characteristics of the High Income Fund.

83.    The Defendants failed that duty to supply accurate information and misrepresented the level of risk associated with the High Income Fund by portraying the Fund as not having "undue risk" and by representing that it would have a "broadly diversified portfolio to help moderate the special risk of investing in high-yield debt instruments".

84.    The aforementioned statements were false and misleading.

85.    The Defendants made the false statements with the intent to induce the Plaintiffs to invest money in the High Income Fund and to keep the money invested in the Fund as the Fund took on excessive risk.

86.    The Plaintiffs relied on the truth of the statements made by Defendants when they invested in the Fund and stayed invested in the Fund throughout 2008 as the Fund

collapsed.

87.     As a direct and proximate result of the reliance on the aforesaid false statements, the Plaintiffs suffered financial loss of about $400,000.

WHEREFORE, the Plaintiffs pray for judgment against the defendants for:

a.     actual damages;

b.     attorney fees;

c.     reasonable costs; and

d.     any other remedy that the Court deems just and equitable.

### COUNT IV – Negligent Supervision
(All Plaintiffs v. All Defendants)

88.     The Plaintiffs restate and reallege paragraphs 1 through 87 as though fully stated herein as paragraph 88.

89.     At all times relevant, Defendants OFI and OFDI had duties to supervise its agents and registered representatives, including Manioudakis, to protect their customers.

90.     Defendants OFI and OFDI had a duty to provide procedures and policies to supervise Manioudakis to ensure that he invested the Fund's assets properly and within the confines of the Fund's investment parameters as outlined in the Fund's Prospectus and Statement of Additional Information.

91.     Defendants OFI and OFDI breached its duty to its customers, including Plaintiffs, by the following acts or omissions:

a.     Failing to adequately supervise Manioudakis;

b.     Failing to establish adequate and/or written procedures to supervise and monitor the conduct of Manioudakis;

     c.      Failing to enforce its supervisory procedures and policies to monitor the conduct of Manioudakis; and

     d.      Failing to ensure that Manioudakis' trading strategy was proper in light of the investment objectives of the Fund.

92.     As a direct and proximate result of Defendant OFI's and OFDI's breach of their duties, the Plaintiffs suffered financial damage, plus loss of interest.

WHEREFORE, the Plaintiffs pray for judgment against the defendants for:

     a.      actual damages;

     b.      attorney fees;

     c.      reasonable costs; and

     d.      any other remedy that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,


  /s/ David Neuman_____

One of the Plaintiffs' Attorneys

David Neuman
Stoltmann Law Offices, P.C.
10 S. LaSalle St., Suite 3500
Chicago, IL 60603
Tel: (312) 332-4200
Fax: (312) 332-4201
daveneuman@stoltlaw.com