## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01528-JLK

RAE ROBINSON and KELLY FOSTER,

    Plaintiffs,

v.

OPPENHEIMERFUNDS, INC., a Colorado corporation, and
OPPENHEIMERFUNDS DISTRIBUTOR, INC., a New York corporation,

    Defendants.

---

## DEFENDANTS' MOTION TO DISMISS

---

    Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure,

defendants, OppenheimerFunds, Inc. ("OFI") and OppenheimerFunds Distributor, Inc.

("OFDI"; collectively, "Defendants"), respectfully move to dismiss Plaintiffs' Complaint,

with prejudice, as explained further below.

## <u>INTRODUCTION</u>

    This is a case in which the Plaintiffs are attempting to bring stale claims about

conduct that did not affect them in any way.  Plaintiffs, Rae Robinson and Kelly Foster,

allege that, in 2000, they purchased variable life insurance policies and invested funds

within the policies' sub-accounts in the Oppenheimer High Income Fund/VA ("High

Income Fund" or "Fund") – a self-described "junk bond" fund.  Plaintiffs allege that from

late-2006 through 2008, *i.e.*, six years *after* they invested in the Fund, the Fund's

disclosures misled investors about the Fund's overall risk profile.  Plaintiffs, however, do not allege that they even saw, much less relied upon, any of these purportedly misleading disclosures.  Nevertheless, Plaintiffs have now filed this lawsuit claiming that the disclosures somehow injured them and that Defendants are responsible for losses suffered during the financial crisis of 2008.  As discussed below, Plaintiffs fall far short of adequately pleading fraud, negligent misrepresentation, negligent supervision, or violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 through 1121.  Defendants' motion to dismiss should therefore be granted with prejudice as to all of Plaintiffs' claims.

*First, Plaintiffs' claims are time-barred under the applicable three-year statute of limitations.*  Plaintiffs allege that, beginning in late 2006, the Fund failed to disclose that it was investing in derivative instruments and mortgage-backed securities.  However, the Fund disclosed more than three years before this Complaint was filed in June 2012 that the Fund was investing in these very securities.  The Fund also disclosed in early 2009 that it had fallen in value by nearly 80% during 2008.  Indeed, more than three years before this case was filed, numerous class action and individual cases were filed by investors regarding the Oppenheimer Champion Income Fund – a fund that Plaintiffs admit was a "clone" of the High Income Fund.  Thus, Plaintiffs were on notice of their claims prior to June 2009.  As such, the entire Complaint is barred by the statute of limitations.

*Second, Plaintiffs' fraud and negligent misrepresentation claims fail because Plaintiffs are merely "holders."*  Plaintiffs purchased Fund shares in the year 2000. Even under Plaintiffs' own theory, the first alleged misrepresentation did not occur until 2006.  Thus, at the very most, Plaintiffs appear to allege that they "held" Fund shares because of the misrepresentations, not that they purchased shares because of them.  The overwhelming majority of courts have categorically rejected "holder" claims as a matter of law.  The few courts that have not categorically rejected "holder" claims have demanded that plaintiffs satisfy stringent pleading requirements, which Plaintiffs do not even attempt to meet here.  Accordingly, Plaintiffs' fraud and negligent misrepresentation claims should be dismissed.

*Third, Plaintiffs fail to allege that they relied on any of the alleged misstatements, much less plead reliance with the particularity required by Rule 9(b).* Reliance is an essential element of Plaintiffs' fraud, negligent misrepresentation, and CCPA claims.  Thus, Plaintiffs' failure to allege that they relied upon – or were even aware of – any specific alleged misrepresentation dooms these claims.

*Fourth, Plaintiffs' CCPA claim fails because the CCPA does not apply to this case.*  The CCPA applies only to individuals who purchase goods or suffer harm *in Colorado*.  Plaintiffs, however, are Utah residents who allegedly purchased Fund shares and suffered harm in Utah.  In addition, the CCPA does not apply to securities transactions.  Thus, for either of these reasons, Plaintiffs' CCPA claim fails.

*Fifth, Plaintiffs' negligent supervision claim fails because it is a derivative claim.* Here, Plaintiffs do not even purport to bring a derivative action and have not satisfied any of the procedural requirements for bringing such a claim. Thus, the negligent supervision claim fails.

*Sixth, Plaintiffs' conclusory assertions that the Fund made misrepresentations are flatly contradicted by the Fund's actual disclosures.* The High Income Fund told investors that it is a "junk bond" fund and warned investors that it would take on greater risks in the pursuit of greater returns. Contrary to Plaintiffs' baseless allegations, it never once claimed to be a "safe" or "conservative" fund. The Fund specifically disclosed that it would invest in mortgage-backed securities and derivatives – including credit default and total-return swaps – and explained the material risks of those holdings. It also disclosed every single investment it had made, including significant investments in the very sorts of securities that Plaintiffs say were hidden. When the Fund's disclosures are read completely and in context, it is clear that the Fund did not make any misstatements of material fact.

## BACKGROUND

Plaintiffs are Utah residents. *See* Compl. ¶¶ 1-2. They allege that they purchased variable insurance policies from a predecessor to Genworth Financial in the fall of 2000 and decided in December 2000 to invest all of the money in the policies' "sub-accounts" in the Fund. *Id.* ¶¶ 50-51, 55-56. Plaintiffs allege that their Salt Lake City-based financial advisor – who is not affiliated with Defendants – recommended that they invest

in the Fund.  *Id.* ¶¶ 17-18.  Plaintiffs allege that their advisor relied upon unspecified information given to him by Defendants and that he "communicated to the Plaintiffs in general terms that he believed [the Fund] was relatively safe."  *Id.* ¶ 18.  Plaintiffs allege that they relied upon their financial advisor when they invested in the Fund in 2000.  *Id.* ¶ 19.

Plaintiffs allege that the Fund is a "clone" to the Oppenheimer Champion Fund. *Id.* ¶¶ 13, 49.  They claim that, like the Champion Fund, the Fund established a "new trading strategy beginning at the end of 2006" and that the new strategy entailed gambling on derivatives and mortgage-backed securities.  *Id.* ¶ 32.  According to Plaintiffs, the Fund "failed to adequately inform investors of this new strategy," including that the new strategy was "dramatically riskier than those previously used."  *Id.*  Plaintiffs also claim that, in light of the new strategy, the Fund misrepresented, among other things, that it would invest in a "diversified portfolio of high-yield, lower-grade, fixed income securities that the Fund's investment manager, Oppenheimer Funds, Inc. . . . believes does not involve undue risk."  *Id.* ¶¶ 24, 73.

Based on these scant allegations, Plaintiffs allege claims for common law fraud, negligent misrepresentation, negligent supervision, and violations of the CCPA.  As discussed below, each of Plaintiffs' claims fails for multiple, independent reasons.

## ARGUMENT

### I.   THE ENTIRE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS.

#### A.   The Statute of Limitations is Three Years At the Most.

Under either Colorado or Utah law, Plaintiffs' fraud and negligent misrepresentation claims are subject to a three-year statute of limitations. *See* Colo. Rev. Stat. § 13-80-101(1)(c) (1986); Utah Code Ann. § 78B-2-305(3) (2008); *Mackay v. America's Wholesale Lender*, No. 2:11-00628, 2012 WL 464648, at *2 (D. Utah Feb. 13, 2012). Likewise, claims under the CCPA must be brought "within three years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Colo. Rev. Stat. § 6-1-115 (1987). The statute of limitations for Plaintiffs' negligent supervision claim is two-years if the claim accrued in Colorado, Colo. Rev. Stat. § 13-80-102(1)(a), and three years if the claim accrued in Utah. *See* Colo. Rev. Stat. § 13-80-101(1)(k); *Catto v. Kelchner Enters., Inc.*, No. 96-1393, 1997 WL 368284, at *2 (10th Cir. 1997); *Burgess v. Delta Airlines*, No. 10-00927, 2010 WL 3801040, at *2 (D. Colo. Sept. 22, 2010).

Plaintiffs filed their Complaint on June 13, 2012. Thus, the statute of limitations bars any claims of which Plaintiffs were on notice prior to June 13, 2009.

#### B.   The Statute of Limitations Began to Run More Than Three Years Before the Complaint Was Filed.

In essence, Plaintiffs claim that, beginning in 2006, the Fund embarked on a new investment strategy involving derivatives and mortgage-backed securities, but misled

investors about the risks of this new strategy.  The Fund's disclosures and its

performance would have put any reasonable person on notice of the facts underlying this

claim well before June 2009.[1]

> 1.      The Fund's Disclosures Put Plaintiffs on Notice of Their Claims.

For statute of limitations purposes, "investors are presumed to have read

prospectuses, quarterly reports, and other information related to their investments."  *See*

*DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007); *Grubka v.*

*WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1266 (D. Colo. 2006) (offering documents

can put a plaintiff on inquiry notice of claims); *see also Conrady v. Ribardeneira*, No.

86-1745, 1990 WL 112875, at *2 (D. Kan. July 2, 1990) (knowledge contained in

prospectus is imputed to investors).  Here, the Fund disclosed its investments in the very

investments – swaps and mortgage-backed securities – that Plaintiffs claim were hidden

from investors.  *E.g.*, Ex. 1, Oppenheimer High Income Fund/VA, Management

Commentaries and Semiannual Report, at F1-F20 (June 30, 2008).  It also disclosed that

it had suffered dramatic losses.  *See* Ex. 2, Oppenheimer High Income Fund/VA,

---

[1]     This Court may take judicial notice of the contents of the Fund's disclosure documents
because they were referred to in the Complaint or filed with the SEC.  *See Tellabs, Inc. v. Makor*
*Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th
Cir. 2006); *In re Semgroup Energy Partners, L.P., Sec. Litig.*, No. 08-1989, 2009 WL 3713524,
at *1-2 (N.D. Okla. Nov. 4, 2009); *see also Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th
Cir. 2006) (explaining that courts "may consider documents referred to in the complaint or any
matter subject to judicial notice, such as SEC filings").

Management Commentaries and Annual Report, at 2-3 (Dec. 31, 2008).  As such,

Plaintiffs were on notice of their claims well before June 13, 2009.

　　　For instance, Plaintiffs allege that, as part of its new strategy, the Fund began

investing in total-return swaps and credit default swaps in late 2006.  *See* Compl. ¶¶

32-34.  However, well before June 2009, the Fund disclosed the material risks of swaps

along with detailed information about every swap in the Fund's portfolio, including the

Fund's position in the swap, *e.g.*, the buyer or seller of credit protection for credit default

swaps; the notional amount of the swap; and the current value of every swap.  *See infra*

pp. 29-34.  Among other things, the Fund disclosed that, as of June 30, 2008, it had total

assets of $442 million and held total return swaps with a notional value of over $201

million and credit default swaps with a notional value of over $310 million.  *See* Ex. 1,

June 2008 Semiannual Report at F10-F20.[2]  Likewise, the Fund disclosed detailed

information regarding its mortgage-related holdings, including the issuer, tranche,

principal amount, and value.  *See infra* pp. 34-36.  It specifically disclosed that, as of

June 30, 2008, it held $52 million worth of mortgage-backed obligations.  *See* Ex. 1,

June 2008 Semiannual Report at F3.  As such, Plaintiffs were on notice of the very

information they claim was omitted more than three years before they sued.

---

[2]　　Plaintiffs were sent annual and semi-annual reports for the High Income Fund.  *See* Ex. 3,
GE Life & Annuity Separate Account II, Prospectus for the Flexible Premium Variable Life
Insurance Policy, at 60 (Apr. 28, 2000) ("We also will send you an annual and semi-annual
report for each Fund underlying an Investment Subdivision to which you have allocated Cash
Value, as required by the 1940 Act.").

Plaintiffs were also on notice they had suffered injury.  The Fund disclosed – in the very first sentence of its December 31, 2008 Annual Report – that its shares had fallen in value nearly *80 percent* in 2008 *and* that the losses were caused by volatility, price declines, and lack of liquidity affecting the derivative investments and mortgage-backed securities about which Plaintiffs complain.  *See* Ex. 2, December 2008 Annual Report, at 3.  In addition, Plaintiffs implicitly concede that they learned about the losses they had suffered through the fall of 2008 as a result of annual account statements they received in October of each year.  *See* Compl. ¶¶ 54, 59.  Thus, Plaintiffs cannot claim that they were unable to discover their alleged injury more than three years before filing this lawsuit.

> 2.     Plaintiffs Cannot Avoid the Statute of Limitations By Claiming That They Were Unaware of All Damages They Allegedly Suffered.

Plaintiffs attempt to avoid the statute of limitations by claiming that they could not have known the *total* amount of money they had lost until they received their annual account statements in October 2009.  *See id.* (alleging that Plaintiffs could not learn the amount of money lost "in November 2008" until they received their 2009 annual statements in October 2009).  Plaintiffs' argument fails as a matter of law and fact.

First, Plaintiffs' argument is contrary to the law.  Under the law, the statute of limitations does not begin to run only when the plaintiff learns the total amount of damages.  Rather, "once *some* injury has occurred, the statute begins to run, notwithstanding that further injury continues to occur." *Duell v. United Bank*, 892 P.2d

336, 340 (Colo. App. 1994) (emphasis in original).  As the Colorado Supreme Court has explained, "an injury is different from the damages that flow from the injury. . . .

[D]amages do not need to be known before accrual of a claim."  *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 147 n.8 (Colo. 2007); *see also Sterenbuch v. Goss*, 266 P.3d 428, 433-34 (Colo. App. 2011) (rejecting argument that all damages must be known before statute of limitations begins to run); *Torrez v. Eley*, No. 08-02708, 2009 WL 3158127, at *3 (D. Colo. Sept. 24, 2009) ("fraud and misrepresentation claims accrue when the plaintiff begins to suffer *some* injury as a result of her reliance on the misrepresentation or fraud").

Second, Plaintiffs were clearly on notice that they had allegedly suffered injury well before June 2009.  As discussed above, the Fund's December 31, 2008 Annual Statement disclosed that the Fund had fallen in value by nearly 80% in 2008.  Ex. 2, December 2008 Annual Report, at 3.  Moreover, the returns of the "clone" Champion Fund were publicly available.  The Champion Fund, like the Fund, fell nearly 80% during 2008.  *See* Compl. ¶ 23.  Lastly, Plaintiffs admittedly received "annual statements."  *See id.* ¶¶ 54, 59.  Thus, in October 2008, they received statements for periods ending in September or October 2008.  By the end of September 2008, the Fund had fallen dramatically.  *See, e.g.*, Ex. 2, December 2008 Annual Report, at 6.[3]

---

[3]    Plaintiffs do not make allegations regarding their October 2008 statements.  That is because they know that these account statements reflect dramatic losses that undoubtedly would put any reasonable investor on notice of a claim.  Indeed, Plaintiff Rae Robinson's account statements show that the value of her account was $650,980 as of September 28, 2007 and $471,665 as of

Finally, Plaintiffs' argument is belied by the conduct of numerous other investors. Before June 13, 2009, the "clone" Champion Fund had been sued in well-publicized class actions and had been subjected to suits by individual investors.  *See*, *e.g.*, *Estner v. OppenheimerFunds, Inc.*, Civil Action No. 09-1327 (S.D.N.Y.) (filed Feb. 12. 2009); *Hanks v. OppenheimerFunds, Inc.*, Civil Action No. 09-2006 (S.D.N.Y.) (filed Mar. 4, 2009); *Hartley v. OppenheimerFunds, Inc.*, Civil Action No. 09-1982 (S.D.N.Y.) (filed Mar. 4, 2009); *Wallen v. OppenheimerFunds, Inc.*, Civil Action No. 09-834 (D. Colo.) (filed Apr. 10, 2009).[4]  It is simply not plausible that all of these other investors could deduce that they potentially had claims but Plaintiffs could not do so until the fall of 2009.

## II.    PLAINTIFFS CANNOT RECOVER FOR FRAUD OR NEGLIGENT MISREPRESENTATION BECAUSE THEY ARE "HOLDERS."

Plaintiffs' fraud and negligent misrepresentation claims should also be dismissed because Plaintiffs are mere "holders" of Fund shares.  "A 'holder' action is an action in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing."  *In re*

---

September 28, 2008 – a one year decline of over 27%.  Plaintiff Kelly Foster's account statements show that the value of her account was $93,748 as of October 19, 2007 and $43,275 as of October 19, 2008 – a one year decline of over 53%.

[4]     In fact, by March 2009, Plaintiffs' counsel had themselves filed an action regarding the Champion Fund.  *See* Ex. 4, Mar. 13, 2009 letter from FINRA regarding *Gossett v. OFDI*, FINRA Dispute Resolution Arbitration Number 09-1303 (filed Mar. 3, 2009), a FINRA action filed by Plaintiffs' counsel.  Should the Court wish to review a copy of the Statement of Claim in *Gossett*, which is not publicly available, Defendants would be happy to provide the Court with a copy.

*WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2004).  Here,

Plaintiffs purchased Fund shares in 2000 and allegedly held those shares after the Fund

purportedly began making misrepresentations in late-2006.  Plaintiffs' claims fail

because:  (1) the vast majority of jurisdictions do not allow holder claims; and (2) even

assuming Colorado would adopt the minority view that holder claims are viable in

certain, narrow circumstances, Plaintiffs have not come close to alleging the facts

necessary to state a claim under this theory.

### A.    Common Law Holder Claims Cannot Proceed.

"[T]here is general agreement that holder claims cannot be successfully pleaded

under the common law."  *In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2006 WL

752770, at *3 (S.D.N.Y. Mar. 24, 2006).  Courts dismiss common law fraud claims by

holders for many reasons, including the "inherent difficulty of proving reliance and

damages in such actions, as well as the potential for nonmeritorious suits brought merely

to extract a settlement."  *In re WorldCom*, 336 F. Supp. 2d at 319.[5]  As the United States

---

[5]    S*ee Rivers v. Wachovia Corp.*, 665 F.3d 610, 618-19 (4th Cir. 2011) (dismissing holder fraud and negligent misrepresentation claims under North Carolina and South Carolina law); *Arent v. Distribution Scis., Inc.*, 975 F.2d 1370, 1372-73 (8th Cir. 1992) (dismissing holder fraud and negligent misrepresentation claims under Minnesota law); *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 351 (5th Cir. 1987) (dismissing holder misrepresentation claim under Mississippi law); *WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 WL 1017811, at *13 (E.D. Pa. Apr. 29, 2005) (dismissing holder fraud claim under Pennsylvania law); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 486-88 (E.D. Va. 2002) (dismissing holder fraud claim under Virginia law); *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994), *aff'd*, 31 F.3d 66 (2d Cir. 1994) (dismissing holder fraud claim under Connecticut law); *The Calibre Fund, LLC v. BDO Seidman, LLP*, No. 05-095012119S, 2010 WL 4517099, at *5 (Conn. Super. Ct. Oct. 20, 2010) (dismissing holder fraud and negligent misrepresentation claims under Connecticut law); *Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 WL 31926606, at *4-6

Supreme Court explained when rejecting holder claims under the federal securities laws: "[t]he very real risk in permitting" holder claims "is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746-47 (1975).  As the Supreme Court stated, if holder claims were permitted, then "bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosures caused nonselling in a falling market and . . . caused them to allow retrospectively golden opportunities to pass." *Id.* at 747.  This is *precisely* what Plaintiffs seek to do here.  To protect against "nonmeritorious" and speculative claims, this Court should follow those courts that have rejected "holder" claims and dismiss Plaintiffs' fraud and negligent misrepresentation claims, as a matter of law.

**B.**     **Plaintiffs Do Not Satisfy the Few Cases That Have Left the Door Open to Holder Claims.**

The few courts that have not categorically rejected holder claims have subjected them to specific pleading requirements.  Those courts require plaintiffs to allege facts

---

(Del. Ch. Dec. 19, 2002) (dismissing holder fraud claim under Delaware law); *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1168-69 (Ill. 2009) (dismissing holder fraud claim under Illinois law); *Starr Found. v. Am. Int'l Grp., Inc.*, 76 A.D.3d 25, 26 (N.Y. App. Div. 2010) (dismissing holder fraud claim under New York law); *Harris v. Wachovia Corp.*, No. 09-25270, 2011 WL 1679625, at *11-13 (N.C. Super. Ct. Feb. 23, 2011) (dismissing holder fraud and negligent misrepresentation claims under North Carolina law).

demonstrating that they had concrete plans to sell their securities but refrained from doing so in reliance on a specific misrepresentation made directly by the defendant. For example, in *Ohanessian v. Pusey*, No. 09-01113, 2010 WL 728549, at *1 (D. Colo. Feb. 25, 2010), the District of Colorado dismissed the plaintiffs' fraud and negligent misrepresentation holder claims because "[n]one of the Plaintiffs identifie[d], or even allege[d], an instance where he actually planned to sell his [ ] stock but refrained from doing so in reliance on a specific fraudulent misrepresentation of a Defendant." *Id.* at *1 n.2. The court explained that, "[w]ithout allegations of fact tending to demonstrate actual reliance . . . . Colorado courts will not provide a cause of action for fraudulent 'holding.'" *Id.*; *see also In re Enron Corp. Sec. Deriv. & ERISA Litig.*, No. MDL-1446, 2007 WL 789141, at *13 (S.D. Tex. Mar. 12, 2007) ("Without particularity in the pleading of the misrepresentations or of actual and justifiable reliance based on direct communication, the Pandora's box of vexatious and meritless suits . . . would be realized in Texas state courts under common law fraud."); *Small v. Fritz Companies, Inc.*, 65 P.3d 1255, 1265 (Cal. 2003) (plaintiff in a holder action "must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations").

Plaintiffs do not come close to meeting this stringent standard. Instead, they make only the vague, conclusory allegation that they "relied on the truth of the statements made by Defendants when they invested in the Fund and stayed invested in the Fund

throughout 2008 as the Fund collapsed." Compl. ¶ 77; 86.  Like the plaintiffs in

*Ohanessian*, neither Plaintiff "identifies, or even alleges, an instance where [s]he actually

planned to sell [her] stock but refrained from doing so in reliance on a specific fraudulent

misrepresentation of a Defendant." *See* 2010 WL 728549, at *1 n.2.  Accordingly,

Plaintiffs' common law holder claims should be dismissed.

## III.   PLAINTIFFS FAIL TO MEET THE REQUIREMENTS OF RULE 9(b).

Rule 9(b) applies to Plaintiffs' fraud, negligent misrepresentation, and CCPA

claims.[6]  Each of these claims requires Plaintiffs to prove reliance.[7]  Thus, Plaintiffs must

allege with particularity facts sufficient to identify the alleged false statements and how

they personally relied on those statements.  *See*, *e.g.*, *Cook v. Rockwell Int'l Corp.*, 755 F.

Supp. 1468, 1479 (D. Colo. 1991).

Here, Plaintiffs wholly fail to plead reliance, much less particularized facts

establishing that they actually relied on the purported misstatements.[8]  Plaintiffs concede

---

[6]     *See HealthOne of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F. Supp. 2d 1115, 1120-21
(D. Colo. 2011) (CCPA); *Gunningham v. Standard Fire Ins. Co.*, No. 07-02538, 2008 WL
4377451, at *2 (D. Colo. Sept. 18, 2008) (negligent misrepresentation); *Tatman v. API Alarm
Monitoring, Inc.*, No. 06-01336, 2007 WL 8986, at *1-2 (D. Colo. Jan. 2, 2007) (same); *Van
Leeuwan v. Nuzzi*, 810 F. Supp. 1120, 1123 (D. Colo. 1993) (same).

[7]     *See Shriners Hosps. for Children v. Qwest Commc'ns Int'l Inc.*, No. 04-0781, 2005 WL
2350569, at *14-16 (D. Colo. Sept. 23, 2005) (fraud and negligent misrepresentation); *Pauley v.
Bank One Colo. Corp.*, 205 B.R. 272, 276 (D. Colo. 1997) (CCPA); *see also Masters v. Worsley*,
777 P.2d 499, 501-02 (Utah Ct. App. 1989) (fraud); *Marchese v. Nelson*, 809 F. Supp. 880, 891
(D. Utah 1993) (negligent misrepresentation).

[8]     The only semi-particularized allegation regarding reliance is that Plaintiffs' financial advisor
stated in "general" terms that he believed that Fund was "relatively" safe and that Plaintiffs
relied upon unspecified "information that was given to them" by their advisor in 2000.  Compl.

that the Fund's disclosures were not materially misleading until the Fund purportedly adopted a new strategy in late-2006. *See* Compl. ¶¶ 31-32. Yet, Plaintiffs do not allege that they relied upon, or even read, any of the Fund's alleged misstatements during or after that period. For instance, although the Complaint identifies allegedly misleading statements in the Fund's 2008 prospectus, it conspicuously fails to allege that Plaintiffs actually read, or were even aware of, the alleged misstatements.

Instead, Plaintiffs rely exclusively on the vague allegations that they "relied on the truth of the statements made by Defendants when they invested in the Fund and stayed invested in the Fund throughout 2008 as the Fund collapsed." Compl. ¶ ¶ 77, 86.[9] But this is the exact sort of conclusory allegation that courts have routinely found is insufficient under Rule 9(b):

- Securities fraud claim dismissed despite allegation that plaintiffs acted "in reliance upon the defendants' misrepresentations," because plaintiffs "did not allege specific facts showing that they relied on the Prospectus" and "did not claim that they had ever read the Prospectus." *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321-22 (8th Cir. 1997).

- Fraud claim dismissed because plaintiffs failed to allege that they had read the allegedly misleading registration statements, or even

---

¶ 18-19. The alleged misstatements, however, did not begin until 2006. An allegation about what Plaintiffs purportedly relied on in 2000 does nothing to satisfy their obligation to allege with particularity the alleged misstatements upon which they relied.

[9] Plaintiffs also make the similar, and equally deficient, allegation that "[b]ased on the information provided by Oppenheimer and its agents, the Plaintiffs reasonably relied on this information and were unaware that there was substantial risk in the High Income Fund." Compl. ¶ 60. Plaintiffs give no indication as to what "information" they relied on, or even the general time frame of this supposed reliance.

knew of their existence, and instead only alleged that "Plaintiffs and other class members justifiably and reasonably relied upon the express and implied representations of material facts made by Defendants." *Am. Fin. Int'l Group-Asia, LLC v. Bennett*, No. 05-8988, 2007 WL 1732427, at *9-10 (S.D.N.Y. June 14, 2007).

- Fraud and negligent misrepresentation claims dismissed for failure adequately to plead reliance despite allegations that plaintiffs "did in fact reasonably rely" on the alleged misstatements. *Smith v. Mitlof*, 198 F. Supp. 2d 492, 504-05 (S.D.N.Y. 2002).

Plaintiffs' bare-bones allegations of reliance are no better than the allegations that failed to state a claim in these cases, and, therefore, their fraud, negligent misrepresentation, and CCPA claims should be dismissed.

## IV. THE CCPA DOES NOT APPLY.

In addition to failing because: (1) it is time-barred and (2) Plaintiffs do not plead reliance, Plaintiffs' CCPA claim fails because the CCPA does not cover Plaintiffs or their claims.

### A. The CCPA is Inapplicable Because Plaintiffs Are Utah Residents Who Purchased Their Variable Insurance Policies in Utah.

The CCPA does not cover individuals who, like Plaintiffs here, suffered harm in another state. In *Elvig v. Nintendo of America, Inc.*, 696 F. Supp. 2d 1207, 1215 (D. Colo. 2010), the District of Colorado – applying Colorado choice of law rules – held that a plaintiff must proceed under the consumer protection act of his home state. In *Elvig*, nonresidents of Washington who purchased an allegedly defective product in their home states and were injured in their home states brought claims against a Washington corporation under the Washington Consumer Protection Act. *See id.* at 1210. The court

dismissed the claims.  The court explained that, "[t]o the extent the Plaintiffs require protection against deceptive trade practices that are committed against them in their states of residence, the Court should be wary of substituting Washington's protective scheme for the consumer protection of the Plaintiff's own states." *Id*. at 1213.  The court noted that plaintiffs' home states may "protect their residents more or less comprehensively" than Washington and that the application of the law of a non-home state "would subvert the ability of [a home] state[ ] to protect its citizens and regulate those who offer products or services to its citizens." *Id*.  Such application would also "defeat reasonable expectations of [ ] purchasers," who "expect to be protected by the laws applicable to the state where they live, purchase a product and use it." *Id*. at 1213-15.

Here, as in *Elvig*, Plaintiffs – Utah residents – are attempting to bring a claim under the consumer protection laws of a state in which they do not reside, in which they were not injured, and which bears no relationship to their claim (except that it is where one of the Defendants is incorporated).[10]  Accordingly, the CCPA does not apply and

---

[10]   Plaintiffs' connection to Colorado is even more attenuated than were the plaintiffs' connection to Washington in *Elvig*.  Here, the Plaintiffs did not even purchase a product from a Colorado corporation.  They purchased a product from GE Life & Annuity, a Virginia corporation, and it was GE Life & Annuity, *not Plaintiffs*, that purchased shares of the High Income Fund.  *See* Ex. 3, GE Life & Annuity Flexible Premium Life Insurance Policy Prospectus, at 29 ("We will purchase shares of the portfolios at net asset value and direct them to the appropriate Investment Subdivisions of Separate Account II.").  Moreover, one of the Defendants, OFDI, has no connection to Colorado.

Plaintiffs' CCPA claim should be dismissed.[11]

## B.    The CCPA Does Not Apply to Securities Transactions.

Plaintiffs' CCPA claim fails for yet another reason:  the CCPA does not apply to securities transactions.  *See Farmers Ins. Exch. v. Benzing*, 206 P.3d 812, 817 n.5 (Colo. 2009) (in describing issues presented, characterizing claims for violation of the Colorado Consumer Protection Act as "non-securities claims").  The lack of any other Colorado precedent directly addressing the CCPA's application to securities transactions is not a coincidence, because the Colorado Securities Act ("CSA") already provides a carefully crafted remedial scheme that specifically addresses alleged securities violations.  Under Colorado law, when two statutes attempt to regulate the same conduct, the more specific statute preempts the general statute.  *See Crowe v. Tull*, 126 P.3d 196, 206 (Colo. 2006); *City of Aspen v. Kinder Morgan, Inc.*, 143 P.3d 1076, 1080 (Colo. App. 2006).

Plaintiffs' CCPA claim is apparently an attempt to circumvent the limitations of the CSA, which provides that no claim can be brought "more than five years after the purchase or sale" of the security.  *See* Colo. Rev. Stat. § 11-51-604(8).  This time limit would be rendered meaningless if investors could simply bring their time-barred claims under the CCPA instead.  Plaintiffs' claims, which arise more than *eleven* years after they

---

[11]    Presumably, Plaintiffs chose to bring their claim under the CCPA because the Utah consumer protection act requires all claims to be brought within two years of the alleged act.  *See* Utah Code Ann. § 13-11-19.  But, as *Elvig* makes clear, application of the CCPA to this case would subvert Utah's ability to protect its own citizens and defeat the expectations of Utah residents, who anticipate they will be protected by Utah law.

purchased their insurance policies, are clearly prohibited under the CSA.  The Court

should not allow Plaintiffs to circumvent the CSA's limitation by permitting a claim

under the CCPA.

## V.    THE NEGLIGENT SUPERVISION CLAIM CAN ONLY BE BROUGHT IN A DERIVATIVE ACTION.

Plaintiffs' negligent supervision claim should be dismissed because the claim

belongs to the Fund, not to individual investors.  Plaintiffs' negligent supervision claim is

essentially a mismanagement claim based upon OFI's and OFDI's alleged failure to

ensure that the portfolio manager properly invested the Fund's assets.  *See* Compl. ¶¶

88-91.  Mismanagement claims such as these belong, in the first instance, to the Fund;

shareholders can bring the claims only derivatively, if at all.  *See, e.g., Combs v.*

*PriceWaterhouseCoopers LLP*, 382 F.3d 1196, 1200 (10th Cir. 2004) (applying Colorado

law); *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996); *Nicholson v.*

*Ash*, 800 P.2d 1352, 1356 (Colo. App. 1990); *DLB Collection Trust v. Harris*, 893 P.2d

593, 596 (Utah Ct. App. 1995).  Here, Plaintiffs do not even purport to bring their

negligent supervision claim derivatively and, in any event, they have wholly failed to

meet the strict requirements for bringing a derivative case.  Accordingly, the negligent

supervision claim should be dismissed.

## VI.   THE FUND DID NOT MAKE ANY MISSTATEMENTS OF MATERIAL FACT.

Plaintiffs allege fraud, negligent misrepresentation, and CCPA claims based on

alleged misrepresentations and omissions in the Fund's offering documents.  But

Plaintiffs' conclusory assertions that the Fund made misrepresentations are flatly contradicted by the Fund's actual disclosures.[12] Those disclosures confirm that Plaintiffs have simply cherry-picked a few prospectus statements out of context, an approach to evaluating disclosures that settled law prohibits.   When the Fund's disclosures are read completely and in context, it is clear that the Fund did not make any misstatements of material fact.  Therefore, Plaintiffs' claims fail as a matter of law and their Complaint should be dismissed.[13]

### A.      The Fund Did Not Portray Itself as "Safe" or "Conservative."

Plaintiffs' first theory is that the Fund portrayed itself as a "safe" and "conservative" investment.  Compl. ¶¶ 24-29.  In fact, the Fund did no such thing. Rather, when the Fund's disclosures are read as a whole—as they must be[14]—it is clear the Fund warned investors that it was a "junk bond" fund that took on "greater risks" in

---

[12]    The High Income Fund filed with the SEC annual updates to its registration statement that contained a Prospectus and Statement of Additional Information ("SAI").  *See* 17 C.F.R. §§ 239.15A, 230.495(a).  The Fund also filed with the SEC Annual and Semiannual Reports.  *See* 15 U.S.C. § 80a-29(e).  All of these documents are publicly available and are readily accessible on the SEC's website.  This Court may take judicial notice of these documents.  *See* supra 7 n.1.

[13]    Plaintiffs' claims also fall woefully short of pleading the heightened pleading requirements of Fed. R. Civ. P. 9(b).

[14]    *See, e.g., Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 211 (5th Cir. 2004) (holding that a statement was not misleading when "read in the context of the prospectus as a whole"); *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996) (affirming dismissal of a claim that relied on "a few isolated passages in the lengthy Offering Statement" because it "disregarded the 'total mix' of available information").

search of higher returns.  In addition, none of the particular statements upon which Plaintiffs rely portrays the Fund as being "safe."

1.    The Fund Disclosed That It Was A Risky "Junk Bond" Fund.

As its prospectus explained, the High Income Fund's primary investment objective (the "Investment Objective") was to "seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, [OFI], believed does not involve undue risk." *See, e.g.*, Ex. 5, Oppenheimer High Income Fund/VA Prospectus, at 2 (Apr. 29, 2008).  To meet this objective, the Fund explained that it would invest in, among other things, the following types of securities:

- Junk bonds:  On the first page of text in its prospectus, the Fund disclosed that, under normal circumstances, it would invest "at least 65% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called *'junk' bonds*." *Id.* (emphasis added). The Fund also disclosed that there is *no limit* on the percentage of Fund assets that could be invested in junk bonds.  *Id.* at 3.

- Swaps:  The Fund explained that "swaps," including "credit default swaps," would be one of the three main building blocks of its portfolio, and that the Fund uses certain derivatives to try to enhance income or manage risks.  *Id.* at 2.

- Mortgage-backed securities ("MBS"):  The Fund also disclosed that it could invest in MBS.  *See, e.g., id* at 8.

In addition to disclosing the types of investments it could make, the Fund disclosed the risks associated with these investments, as discussed below.   Furthermore, the Fund

disclosed every single investment in its portfolio on a quarterly basis in its Statement of Investments.

Consistent with its aggressive Investment Objective, the Fund warned investors that they should be ready to bear the "greater risks" of investing primarily in junk bonds and derivatives.  The second page of text of the prospectus provides:

> **Who Is the Fund Designed For?** The Fund's shares are available only as an investment option under certain variable annuity contracts, variable life insurance policies and investment plans offered through insurance company separate accounts of participating insurance companies, for investors seeking high current income from a portfolio that *invests mainly in lower-grade domestic and foreign fixed income securities.*  Those *investors should be willing to assume the greater risks of short-term price fluctuations and the special credit risks that are typical for a fund that invests mainly in lower-grade domestic and foreign fixed-income securities*.  Since the Fund's income level will fluctuate, *it is not designed for investors needing an assured level of current income*.  The Fund is intended to be a long-term investment.  However, the Fund is not a complete investment program.

April 2008 Prospectus at 3 (emphases added).  The Fund also explained that it is "likely to be *more volatile* and has *more risks* than funds that focus on investing in U.S. government securities and investment-grade bonds."  *Id.* at 4 (emphases added).  The Fund warned that *"[t]hese risks mean that you can lose money by investing in the Fund." Id.* (emphasis in original).

2.    Plaintiffs' Allegations That the Fund Was Portrayed as Being "Safe" Miss the Mark.

Plaintiffs claim that the Fund was portrayed as a "safe" or "conservative" fund. None of the statements to which Plaintiff point, however, portrays the Fund as "safe" or is otherwise misleading.

a.    *The Investment Objective Is Not a Promise That the Fund Is Safe.*

Plaintiffs first allege that the Fund's Investment Objective portrayed the Fund as a "relatively safe bond mutual fund." *See* Compl. ¶ 24. The Investment Objective, however, is not a promise that the Fund is safe, will not lose money, or will always perform in line with other junk bond funds. Instead, the Investment Objective was just that – an objective or goal, *not* a fact that could mislead a reasonable investor. And it is well-settled that only misstatements of *fact* can lead to liability for fraud or negligent misrepresentation. *See, e.g., Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 153 (Colo. 2007); *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. App. 2004).

In *In re Alliance North American Government Income Trust, Inc. Securities Litigation*, No. 95-0330, 1996 WL 551732, at *4 (S.D.N.Y. Sept. 27, 1996), for instance, the court dismissed a securities claim based on an investment objective that contained the phrase "prudent investment risk," because that phrase simply announced the fund's goal and was not specific enough to be materially misleading. Similarly, in *In re TCW/DW North American Government Income Trust Securities Litigation*, 941 F. Supp. 326, 338-39 (S.D.N.Y. 1996), the court held that the fund's objective of "earn[ing] a high

level of current income while maintaining relatively low volatility of principal" was "general and indefinite," and thus was "simply not the kind of statement which a reasonable investor would consider important in deciding whether or not to invest." Here, the phrase "undue risk" is no more definite than the phrases "prudent investment risk" or "low volatility of principal." Thus, to the extent that Plaintiffs' claims are based on the Fund's Investment Objective, those claims fail.

The futility of Plaintiffs' reliance on the Investment Objective is all the more apparent when the Objective is read in context with the detailed risk disclosures contained throughout the prospectus, as it must be. In *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 30541, at *1 (N.D. Ill. Feb. 1, 1994), for instance, the fund's investment objective was "to provide as high a level of current income as is consistent with prudent investment management." The court concluded that this general statement was not misleading because "other statements in the Prospectus give meaning" to the objective. *Id*. at *4. "It is not tenable," the court explained, "to base a securities fraud claim on a general statement of the Fund's objective when the Prospectus clearly states that there is no assurance that the objective will be achieved, goes on to list specific risks associated with the particular Fund, and the plaintiffs' loss results from those very risks." *Id*. at *5.[15]

---

[15]  *See also Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 319185, at *5 (N.D. Ill. June 23, 1994) (explaining that because "the investors had the prospectuses which contained explicit risk disclosures . . . they cannot seek to impose liability for the general statements that the investments were 'conservative' and 'prudently managed'"); *In re*

Here, Plaintiffs' claims are even more attenuated than the claim that failed in *Tabankin*. Just like the plaintiff in *Tabankin*, Plaintiffs here are relying on "a general statement of the Fund's objective." *See id.* at *5. And just as in *Tabankin*, the Fund warned investors that "[t]here is no assurance that the Fund will achieve its investment objective." *E.g.*, April 2008 Prospectus at 4. But the Fund also went on to tell investors that it would invest in the very types of securities that Plaintiffs now claim are inconsistent with the Investment Objective, *i.e.*, derivatives and MBS. No misrepresentation claim can exist under these circumstances.

Lastly, any claim based on the Investment Objective fails for another, independent reason: by its own terms, the Investment Objective is a non-actionable statement of opinion. *See, e.g.*, *Brodeur*, 169 P.3d at 153; *Bedard*, 100 P.3d at 592. The Investment Objective is clearly defined by the Manager's subjective belief of the risk of the Fund's investments. It states that the Fund will invest "mainly" in a "diversified portfolio of high-yield, lower-grade fixed income securities" that the Manager "*believes* does not involve undue risk." *E.g.*, Ex. 5, April 2008 Prospectus, at 2 (emphasis added). Thus, the Investment Objective amounts to an *opinion* by the Manager that the Fund's overall portfolio is appropriate in light of the Manager's assessment of risks and expected returns; it certainly does not promise that particular investments will be "safe" or will

---

*N.Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 478-79 (E.D.N.Y. 2006) (statement that a bank was "risk-averse" was not materially misleading because of the "numerous disclosures" the bank made "regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments").

perform a certain way in the future.  For this additional reason, Plaintiffs' reliance on the Investment Objective fails.

                    b.     *The Prospectus's Reference To A Diversified Portfolio Was Not Materially Misleading*

As another "example" of how the Fund allegedly portrayed itself as a "relatively safe bond mutual fund," Plaintiffs quote the section of the prospectus entitled "How Do the Portfolio Managers Decide What Securities to Buy or Sell" and highlight in boldface the reference to the Manager's strategy of building a "broadly diversified portfolio to help moderate the special risk of investing in high-yield debt instruments."  Compl. ¶ 24. Although the boldface implies that this language is somehow materially misleading, the Complaint makes no attempt to explain *why* this phrase is materially misleading, or how the Fund's actual investments departed from Plaintiffs' unstated test for what constitutes a "diversified" portfolio.  For those reasons alone, any claim based on the phrase "diversified portfolio" should be dismissed.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (dismissing a securities claim because "nowhere in the complaint are facts alleged showing that anything about these statements is false").

Beyond Plaintiffs' pleading failure, no claim could arise based upon the "diversified portfolio" language.  The Fund was required to – and did – comply with the Investment Company Act's  ("ICA") definition of "diversified."  Under the ICA definition, which was incorporated into the Fund's prospectus, a fund is "diversified" if

it meets each of the following definitions with respect to 75% of the value of the fund's total assets:

(1)   of the securities included, the fund may not have more than 10% of the outstanding voting securities of any one company; and

(2)   not more than 5% of the fund's assets may be in the securities of any one company.

J. William Hicks, *International Dimensions of U.S. Securities Laws* § 5:50; 15 U.S.C. § 80a-5(b)(1).[16]  Plaintiffs do not – indeed, they cannot – allege that the Fund violated either of these conditions.

> c.   *The Past Performance Chart in the Prospectus Was Not Misleading*

Plaintiffs claim that a chart in the prospectus showing the average annual total returns of the Fund's shares "was inserted into the Prospectus to lead investors to believe that this was not a risky or volatile Fund," because the "worst year that this Fund suffered prior to 2008 was a return of negative 3.74%." *See* Compl. ¶ 25.  Plaintiffs themselves admit that the chart was accompanied by the caution that "past investment performance is not necessarily an indication of how the Fund will perform in the future."  *Id.*  The chart is merely a presentation of factual information about the Fund's past performance. Plaintiffs do not, and cannot, allege that the information was inaccurate.

---

[16]   The Fund incorporated this definition into a "fundamental policy."  *See, e.g.*, April 2008 SAI at 40.

        d.    *The "Saving for Retirement" Brochure Is Not Actionable.*

As another "example" of how Defendants portrayed the Fund as "relatively safe," Plaintiffs cite an Oppenheimer brochure entitled "Saving for Retirement: How to Make the Most of Your Company's Plan" which contains a chart showing high-yield fixed-income mutual funds to be generally more conservative than equity mutual funds. Compl. ¶ 28. The brochure does not contain any representations about the High Income Fund specifically, and Plaintiffs have not made any effort to explain why this chart is misleading. Thus, Plaintiffs' reliance on the chart is misplaced.

Furthermore, it is well-settled that the truthfulness of alleged misrepresentations must be assessed at the time the statements are made. *See, e.g., Hartford Fire Ins. Co. v. Colorado Div. of Ins.*, 824 P.2d 76, 81 (Colo. App. 1991). Although this brochure is dated February 21, 2005, even under Plaintiffs' own theory, the Fund did not allegedly begin to become unduly risky until late 2006.[17] Thus, even if the chart would be actionable had it been issued at a later date, it was not actionable when issued.

        e.    *The Fact That Other Oppenheimer Funds Invested in the Champion Fund Is Not Actionable*

Plaintiffs' final "example" of how Defendants portrayed the High Income Fund as a "conservative or safe bond fund[]" is that "other conservative Oppenheimer funds held substantial positions in the Champion Income Fund." Compl. ¶ 27. Plaintiffs are clearly grasping at straws with this allegation. First, this allegation involves the Champion

---

[17]    Compl. ¶¶ 31-32.

Income Fund, and not the High Income Fund, *i.e.*, the Fund that is at issue in this case. Second, other Oppenheimer funds' positions in the Champion Income Fund are not representations of the risks of the Champion Fund, let alone misrepresentations of fact. Lastly, Plaintiffs point to no statement – by either the High Income Fund or the Champion Fund – disclosing that these other funds had invested in the Champion Fund. For any of these reasons, this "example" provides no basis for a misrepresentation claim.

> **B.     The Fund Made Extensive Disclosures Regarding Its Investments in Swaps and Mortgage-Backed Securities.**

Plaintiffs' second theory is that Defendants failed to adequately inform investors of the Fund's "new trading strategy" of using derivatives such as total-return swaps and credit-default swaps and investing in MBS. *See* Compl. ¶ 32-34. Plaintiffs further allege that Defendants failed to disclose certain aspects and risks of these investments. These allegations are flatly contradicted by the Fund's prospectus, which clearly disclosed that the Fund could invest in swaps and MBS, and explained in detail the risks associated with these types of securities.

> 1.     <u>The Fund Made Extensive Disclosures Regarding Swaps</u>

The Fund (1) explained swaps to investors; (2) told investors that swaps would be one of the main building blocks of its portfolio; (3) explained the risks of swaps, including their leveraging effects; and (4) disclosed its actual investments in swaps on a quarterly basis.

a.      *The Fund Explained Swaps And Made Clear That Swaps Would Be A Primary Component of Its Portfolio*

*First*, the Fund defined both credit default and total return swaps.  The Fund explained that credit default swaps are, as Plaintiffs allege, "similar to insurance contracts that protect investors against bond and loan defaults."  *See* Compl. ¶ 34.  Specifically, the Fund disclosed that a credit default swap "enables an investor to buy or sell protection against a credit event, such as an issuer's failure to make timely payments of interest or principal, bankruptcy or restructuring."  Ex. 5, April 2008 Prospectus, at 7.  The Fund then explained the difference between buying and selling credit protection via a credit default swap, making clear that sellers of credit protection can be liable for paying the par amount of defaulted bonds:

> If the Fund buys credit protection using a credit default swap, the Fund will make fixed payments to the counterparty.  If a credit event occurs, the Fund will deliver the defaulted bonds underlying the swap and the swap counterparty will pay the par amount on the bonds.  If the Fund sells credit protection using a credit default swap, the Fund will receive fixed payments from the counterparty.  If a credit event occurs, the Fund will pay the par amount of the defaulted bonds underlying the swap and the swap counterparty will deliver the bonds.

*Id.*

The Fund also explained that total return swaps are simply an arrangement whereby two parties exchange the returns on two different sets of assets (or indices):

> The Fund may enter into total return swaps, under which one party agrees to pay the other the total return of a defined underlying asset, such as a security or basket of securities, or

31

> non-asset reference, such as a securities index, during the
> specified period in return for periodic payments based on a
> fixed or variable interest rate or the total return from different
> underlying assets of references.

Ex. 6, Oppenheimer High Income Fund/VA Statement of Additional Information

("SAI"), at 24 (Apr. 29, 2008).

The Fund's prospectus also made clear that swaps would be a major building

block of the Fund's portfolio.  As early as April 2007, swaps were specifically identified

as one of three primary types of fixed-income securities in which the Fund would invest.

*See* Ex. 7, Oppenheimer High Income Fund/VA Prospectus, at 2 (Apr. 30, 2007)

(disclosing that the Fund's investments "primarily include . . . Swaps, including single

name and index-linked credit default swaps").  Likewise, the section of the Fund's

prospectus entitled "About the Fund's Investments" always identified swaps as one type

of Fund investment.  *See, e.g.*, *id.* at 7.

           b.    *The Fund Disclosed the Risks of Swaps*

*Second*, the Fund disclosed the principal risks of swaps on multiple levels:  (1) it

disclosed the risks of derivatives generally, (2) it disclosed the risks of swaps generally,

and (3) it disclosed the risks of total return swaps and credit default swaps in particular.

To begin with, the Fund repeatedly explained that swaps were a form of derivative

investment on which the "Fund can lose money" and which present many of the same

risks as all other derivatives:

> If the issuer of the derivative does not pay the amount due,
> **the Fund can lose money on the investment**.  Also, the

32

> underlying investment on which the derivative is based, and the derivative itself, *might not perform the way the Manager expected it to perform*.  If that happens, *the Fund's share prices could decline* and the Fund could receive less income than expected.  Some derivatives may be *illiquid*, making it difficult to value them or sell them at an acceptable price.  Using derivatives can *increase the volatility of the Fund's share prices*.

Ex. 5, April 2008 Prospectus, at 4 (emphases added).

With regard to swaps, the Fund disclosed the precise risks about which Plaintiffs complain: (1) swaps can be illiquid, Compl. ¶ 31; (2) swaps can add "leverage" to the Fund's portfolio, *id.* ¶¶ 31, 37; and (3) the Fund's managers could be wrong about how the assets underlying the swaps will perform, *id.* ¶¶ 33-34.  The Fund's SAIs concisely captures all three of these risks (among others) in the following disclosure:

> The use of swap agreements by the Funds entails certain risks.  The swaps market is generally unregulated.  There is no central exchange or market for swap transactions and therefore they are *less liquid* investments than exchange-traded instruments and *may be considered illiquid* by a Fund.  Swap agreements entail credit risk arising from the possibility that the counterparty will default . . . .  A Fund's *successful use of swap agreements is dependent upon the Manager's ability to predict correctly whether certain types of investments are likely to produce greater returns than other investments.  Swap agreements may effectively add leverage to a Fund's portfolio because that Fund would be subject to investment exposure on the notional amount of the swap.*

Ex. 6, April 2008 SAI, at 24 (emphases added).

The Fund's specific disclosures about credit default swaps and total return swaps reiterated that these particular forms of swaps posed substantial risks.  For example, the Fund's prospectus stated that:

> Credit default swaps are subject to counterparty credit risk (if the counterparty fails to meet its obligations).  They are subject to the risk that the Fund will not properly assess the cost of the instrument.  If the Fund is selling credit protection, there is a risk that a credit event will occur and that the Fund will have to pay par value on defaulted bonds.

*E.g.*, Ex. 5, April 2008 Prospectus, at 7.  Similarly, the Fund's SAI explained that "[t]otal return swaps could result in losses if the underlying asset or reference does not perform as anticipated by the Manager."  Ex. 6, April 2008 SAI, at 24.

c.   *The Fund Disclosed The Amount Of Its Investments In The Swaps*

*Third*, and significantly, the Fund disclosed its *actual transactions* in swaps on a quarterly basis in its Statement of Investments.  The Statements of Investments disclosed detailed information about every swap in the Fund's portfolio, including the Fund's position in the swap, *e.g.*, buyer or seller of credit protection for credit default swaps, the notional amount of the swap, and the current value of every swap transaction.  Furthermore, by explaining that swap investments "may effectively ***add leverage*** to a Fund's portfolio because that Fund would be ***subject to investment exposure of the notional amount of the swap***" and disclosing the notional amount of each swap in its Statement of Investments, the Fund disclosed precisely the extent to which its assets,

34

including swaps, were exposed to leverage.  Ex. 6, April 2008 SAI, at 24 (emphasis added).[18]

        d.    *The Fund Made Extensive Disclosures Regarding Mortgage-Backed Securities*

Much like its disclosures about swaps, the Fund's disclosures about MBS included (1) a statement that the Fund could invest in MBS and a concise description of those securities; (2) a detailed discussion of the risks inherent in MBS; and (3) a complete list of the MBS held by the Fund.

First, the Fund explained that it could "buy interests in pools of residential or commercial mortgages, in the form of collateralized mortgage obligations ('CMOs') and other 'pass-through' mortgage securities."  Ex. 5, April 2008 Prospectus, at 8.  The Fund also explained MBS to investors.  For example, the April 2008 SAI explains:

> Mortgage-related securities (also referred to as mortgage-backed securities) are a form of derivative instruments collateralized by pools of commercial or residential mortgages.  Pools of mortgage loans are assembled as securities for sale to investors by government agencies or entities or by private issuers.

Ex. 6, April 2008 SAI, at 9.  The SAI goes on to explain that CMOs are multi-class bonds that are collateralized either by mortgages or by other securities that are backed by mortgages (known as "pass-through certificates").  *Id.* at 10-11.

---

[18]   For instance, the Fund disclosed that, as of June 30, 2008, it had total assets of $442 million and held total return swaps with a notional value of over $201 million and credit default swaps with a notional value of over $310 million.  *See* Ex. 1, June 2008 Semiannual Report at F10-F20.

*Second*, the Fund's disclosures repeatedly conveyed that MBS entail significant risks.  For example, the Fund explained in detail the interest rate volatility associated with CMOs.  *See, e.g.*, Ex. 5, April 2008 Prospectus, at 8-9.  The Fund also disclosed that "the values of mortgage-related securities may be affected by changes in the market's perception of the creditworthiness of the entity issuing the securities or guaranteeing them.  Their values may also be affected by changes in government regulations and tax policies."  Ex. 6, April 2008 SAI, at 10.

*Third*, the Fund disclosed its actual investments in MBS.  In its Statement of Investments, the Fund provided detailed information – including the issuer, security, series, tranche,[19] current interest rate, and maturity date – for each and every one of the MBS in its portfolio.  Additionally, the Statement of Investments noted each investment – including each MBS – that the Manager deemed to be illiquid under applicable SEC guidance.  *See, e.g.,* Ex. 1, June 2008 Semiannual Report, at F36 (explaining that "[s]ecurities that are illiquid are marked . . . on the Statement of Investments").

As with swaps, the Fund's Statement of Investments disclosed the amount of the Fund's MBS investments.  The Statements of Investments clearly stated the percentage of the Fund's total assets invested in MBS.  For example, the Statement of Investments as of June 30, 2008 contains a bold-faced entry stating "**Mortgage-Backed Obligations –**

---

[19]   Plaintiffs simply are wrong when they allege that the Fund failed to disclose the tranches of MBS in which it invested.  *Compare* Compl. ¶ 31(f) with Ex. 1, June 2008 Semiannual Report, at F1 (disclosing the tranches of MBS).

**12.9%**" and a disclosure that it held $52 million worth of these obligations.  Ex. 1, June

2008 Semiannual Report, at F1-F3.

> ### C.    Plaintiffs Do Not State a Claim Regarding the Fund's Investment Limitations.

Plaintiffs' final theory is that the Fund misleadingly stated that was in compliance

with certain investment limitations when it allegedly was in violation of those limits.  As

discussed below, Plaintiffs' allegations regarding these limitations fall far short.

> ### 1.    Plaintiffs Do Not State a Claim Regarding the Fund's Industry Concentration Limit.

Under SEC rules, the Fund could not invest more than 25% of its assets in any one

"industry," a term that the Fund has wide discretion to define.   Plaintiffs allege that "it is

believed that the Fund had a huge over-concentration in the mortgage industry, well

above this 25% amount."  *See* Compl. ¶ 42.  Plaintiffs' claim fails as a matter of pleading

and fact.  First, this sort of vague, unsupported "it is believed" allegation plainly fails to

meet the requirements of Rule 9(b).[20]  Second, Plaintiffs are wrong as a factual matter.

*E.g.*, Ex. 1, June 2008 Semiannual Report, at F1 (disclosing "Mortgage-Backed

Obligations" of 12.9%).  Finally, the claim fails because Plaintiffs do not and cannot

allege that the Fund purported to have a "mortgage industry" classification.  *See, e.g.,*

*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*, No. 01-8139,

---

[20]    *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefit Trust v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010) (claims made on information and belief not sufficiently particular to plead fraud unless they accompany a statement of facts upon which the belief is founded).

2002 WL 31119441, at *3-4 (S.D.N.Y. Sept. 25, 2002). Rather, the "mortgage industry" is a classification of Plaintiffs' own creation and not one which the Fund used.[21]

### 2. Plaintiffs Do Not State A Claim Regarding the Fund's Bank Borrowing Limit

Next, Plaintiffs allege that the leverage inherent in the Fund's swap investments somehow caused the Fund to violate its borrowing limitation. *See* Compl. ¶¶ 39-41. But the limitation on which Plaintiffs rely applies only to *borrowing money*; it does not apply to leverage: "The Fund[ ] cannot *borrow money* in excess of 33 1/3% of that Fund's total assets." Ex. 6, April 2008 SAI, at 40 (emphasis added). *See Lapidus v. Hecht*, No. 98-03130, 2002 WL 1034042, at *6 (N.D. Cal. May 17, 2002) (rejecting the argument that a limit on "bank borrowing" in a fund's SAI applied to something other than bank borrowing). Moreover, as discussed above, the Fund disclosed the leveraging effect of swaps and the notional value of each of its swaps. *See supra* pp. 33-34. Thus, no investor could have been misled into believing that the bank borrowing limit somehow applied to the Fund's swap investments.

### 3. Plaintiffs Do Not State A Claim Regarding Illiquidity

Finally, Plaintiffs allege that the "Fund exceeded the allowable amount of 'illiquid' or 'restricted' securities that the Fund could invest in." *See* Compl. ¶¶ 31(e),

---

[21] Plaintiffs' related claim that the Fund "failed to disclose the risks related to concentrating the Fund's assets in one particular industry or in one type of investment" (Compl. ¶ 31(d)), fails for the same reasons. As Plaintiffs have not stated a claim that the Fund over-concentrated its investments in one industry, they also cannot state a claim that the Fund had a duty to disclose the risks of such over-concentration.

38

43. But Plaintiffs offer absolutely no support for this conclusory allegation. As discussed above, the Fund's quarterly Statement of Investments noted each investment that the Manager deemed to be illiquid. *See, e.g.,* Ex. 1, June 2008 Semiannual Report, at F36 (explaining that "[s]ecurities that are illiquid are marked . . . on the Statement of Investments"). The Statements of Investments also clearly disclose the aggregate value of illiquid securities and the percentage of the Fund's assets that were illiquid. For example, "[t]he aggregate value of illiquid securities as of June 30, 2008 was $10,094,153, which represents 2.51% of the Fund's net assets." *Id.* at F9. Plaintiffs have not – and cannot – allege that any of this information was inaccurate. Nor do they identify a *single* security that allegedly was illiquid but was not identified by the Fund as being illiquid. Especially given that the Fund disclosed every single one of its investments, Plaintiffs' conclusory allegations are woefully deficient.

## CONCLUSION

Plaintiffs' Complaint should be dismissed for multiple, independent reasons. *First*, Plaintiffs entire Complaint is time-barred. *Second*, Plaintiffs fail to state a fraud or negligent misrepresentation claim because they are holders. *Third*, Plaintiffs fail to state claims for fraud, negligent misrepresentation, and CCPA violations because they do not make factual allegations showing that they reasonably relied upon the alleged misstatements. *Fourth*, Plaintiffs' CCPA claim fails because that statute does not apply and their negligent supervision claim fails because it cannot be brought in a direct shareholder action. *Finally*, when the Fund's disclosures are read fully and in context, it

is clear that Plaintiffs fail to allege a material misstatement of fact.  Accordingly, for

these reasons, Plaintiffs' Complaint should be dismissed, with prejudice.

Respectfully submitted this 24th day of August, 2012.

Respectfully submitted,

*s/ Lino S. Lipinsky de Orlov*
Lino S. Lipinsky de Orlov
McKenna Long & Aldridge LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone:  (303) 634-4000
Facsimile:  (303) 634-4400
Email:  llipinsky@mckennalong.com

*s/ Michael Scott Doluisio*
Michael Scott Doluisio
Dechert, LLP-Philadelphia
2929 Arch Street
Cira Centre
Philadelphia, PA 19104-2808
Telephone:  (215) 994-2325
Facsimile:  (215) 994-2222
Email:  michael.doluisio@dechert.com

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of August, 2012, I electronically filed a true

and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS** was

electronically filed with the clerk of the court using the CM/ECF system, which will send

notification of such filing to the following:

>David Neuman, Esq.
>Stoltmann Law Offices, P.C.
>10 S. LaSalle Street, Suite 3500
>Chicago, IL 60603
>*daveneuman@stoltlaw.com*

>*s/ Lisa King*
>Lisa King

DN:32231930.2