IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-01528-JLK

RAE ROBINSON and KELLY FOSTER,

      Plaintiffs,

v.

OPPENHEIMERFUNDS, INC., a Colorado corporation, and
OPPENHEIMERFUNDS DISTRIBUTOR, INC., a New York corporation

      Defendants.

---

### DEFENDANTS' REPLY BRIEF IN SUPPORT OF
### THEIR MOTION TO DISMISS

---

### PRELIMINARY STATEMENT

In their Opposition Brief, Plaintiffs either concede or do not dispute several key

facts that doom each of their claims:

- Plaintiffs' claims are time barred:  Plaintiffs do not dispute that, more than three years before they filed this suit, they either knew or should have known that the Fund had declined ***by 80%***.  As numerous courts have held, such steep declines put an investor on notice of a claim that she was misled into believing that an investment was "safe" or "conservative," which is precisely the claim Plaintiffs are making here.  Thus, all of Plaintiffs' claims are time-barred.  Indeed, numerous other investors filed lawsuits and FINRA claims based upon the same information that was available to Plaintiffs.

- Plaintiffs' are bringing invalid "holder" claims:  Plaintiffs admit that they invested in the Oppenheimer High Income Fund/VA (the "High Income Fund" or the "Fund") in 2000, and merely "held" their shares from 2006-2008, when the allegedly misleading statements were made.  Moreover, Plaintiffs do not dispute that they have pleaded ***no facts whatsoever*** suggesting that they ever had any concrete plans to sell their shares or even read any of the documents that

purportedly omitted material facts.  Thus, as mere holders, Plaintiffs fail to state a claim.

- Plaintiffs fail to plead reliance:  Reliance is an essential element of each of Plaintiffs' misrepresentation claims, yet Plaintiffs do not dispute that ***they never read the allegedly misleading prospectuses***.  Because Plaintiffs do not—and apparently cannot—plead reliance, their claims fail.

- Plaintiffs cannot invoke the Colorado Consumer Protection Act ("CCPA"): Plaintiffs admit that they are Utah residents who allegedly invested in the Fund based on the advice of their Salt Lake City-based investment advisor.  Thus, they cannot invoke Colorado's consumer protection statute; instead, they must look to the consumer protection law of their own state.

- Plaintiffs cannot sue directly for purported negligence that injured the Fund: Plaintiffs do not dispute that OFI had a management contract ***with the Fund***, not with them.  Thus, as numerous courts have held in identical circumstances, a claim against the Fund's manager for alleged mismanagement can only be asserted by shareholders derivatively, if at all.  Because Plaintiffs do not even attempt to bring a derivative claim, their negligence claim fails.

- Plaintiffs fail to plead a material misstatement or omission of fact: Plaintiffs concede that the Fund disclosed its investments in swaps and mortgage-backed securities ("MBS") and the principal risks of those investments.  Thus, Plaintiffs are left with the claim that the Fund failed to predict the losses that it ultimately suffered during the financial crises.  Such "failure to predict" theories fail to state a claim, as a matter of law.

In sum, each of Plaintiffs' claims is factually and legally flawed and should be dismissed with prejudice.

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Plaintiffs' claims should be dismissed because they are time-barred.  Plaintiffs concede, as they must, that their claims are barred if they knew or should have known about them before June 2009.  *See* Defs.' Opening Br. (ECF No. 6) at 6; Pls.' Opp'n Br.

(ECF No. 10) at 5.  Plaintiffs also do not and cannot dispute that (1) the Fund's 2008 Annual Report—which was released in early 2009, months prior to June 2009—stated that the Fund had declined in value *by 80%*; and (2) as a matter of law, Plaintiffs are charged with knowledge of that fact, regardless of whether they read the Report.  *See* Opening Br. at 7; Opp'n Br. at 7 (acknowledging that the 2008 Annual Report disclosed a decline of 80%); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001) (explaining that, for statute of limitations purposes, "investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments"). Instead, Plaintiffs' only argument is that a severe price decline, standing alone, "does not necessarily suggest" that there was a misstatement.  Opp'n. Br. at 7 (quotation marks omitted).

Plaintiffs' argument cannot be squared with the claims they are actually asserting. According to Plaintiffs, they were misled into believing that the Fund was a "safe" and "conservative" investment.  Compl. ¶¶ 24-29.  As numerous courts have held in essentially identical circumstances, sharp declines in value are inherently inconsistent with statements that investments are "safe" and "conservative" and, therefore, such declines *do* put plaintiffs on notice that they were misled:

- Where the plaintiffs alleged that they were misled into believing that certain funds were "low-risk, conservative investments," the statute of limitations began to run when the plaintiffs learned that the net asset values and distributions from the Funds had declined dramatically because such an outcome "is simply inconsistent with a conservative investment vehicle[.]"  *Mathews,* 260 F.3d at 242.

- Because the plaintiff alleged that he was misled into believing that the companies in which he invested were "sound" with "little attendant risks," the statute of limitations began to run when the plaintiffs received, among other things, "[a]nnual and quarterly reports from the companies" that "revealed sharp declines in market prices . . . ." *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 693 (8th Cir. 1981).

- "[T]he limitations period commences running in a securities fraud case when a securities investor learns that an investment represented as having low risk and high potential performs directly contrary to those representations." *Hecox v. R.G. Dickinson & Co.*, No. 84-1789, 1987 WL 14502, at *12 (D. Kan. Jan. 12, 1987).

- Because the plaintiff alleged that she was misled into believing that certain bond investments would be "stable" and "no risk," the statute of limitations began to run as soon as the plaintiff should have learned that her bonds were being sold at a loss. *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1342, 1344 (8th Cir. 1980).

- "[P]laintiffs were put on inquiry notice . . . [when] a stock which they had been told a year earlier was greatly undervalued and would soon be worth twice as much and at worst would not fall by more than 10 percent had lost almost 90 percent of its value." *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 720 (7th Cir. 1993).

Moreover, the Fund disclosed the very facts on which Plaintiffs rely in their Complaint. Thus, Plaintiffs did not merely know of their losses prior to June 2009, they also knew of the very investments that they claim caused those losses. Specifically, Plaintiffs allege that, in "late 2006," the Fund began pursuing "risky trading strategies," *i.e.*, investing in swaps and MBS. Compl. ¶ 31. The Fund, however, disclosed that its managers had the discretion to make these investments, and Plaintiffs do not and cannot dispute that the Fund regularly disclosed each of its swap and MBS investments in reports sent to shareholders. *See* Opening Br. at 8 & n.2. Because Plaintiffs are charged

with this knowledge, they knew or should have known the facts underlying their claims long before June 2009.

Rather than acknowledge the voluminous case law addressing claims just like theirs, Plaintiffs rely on two cases that are easily distinguishable. *See* Opp'n Br. at 7. In *Gray v. Winthrop Corp.*, 82 F.3d 877, 880 (9th Cir. 1996), there were no allegations that plaintiffs were misled into believing that an investment was "safe" or "conservative." Instead, the plaintiffs in that case alleged that the real estate partnership in which they invested misrepresented historical data regarding the building it owned, such as vacancy rates, redesign costs, and rental rates. *See id*. at 880-83. In such a case, poor financial performance would not necessarily alert investors that any of these data points was false. *See id.* at 882. Similarly, the plaintiffs in *LaSalle v. Medco Research*, 54 F.3d 443, 445 (7th Cir. 1995), did not allege that they were duped into believing that an investment was "safe" or "conservative." Rather, they alleged that a pharmaceutical company misrepresented that FDA approval of a drug was imminent. *See id*. Thus, on those facts, a steep decline in stock price would not necessarily signal to investors that the company's statement regarding FDA approval was false. *See id*. at 445-46.

In sum, the case law that is on point squarely holds that sharp declines in value— such as the 80% decline suffered by the Fund—put reasonable investors on notice that the investments were not "conservative or safe bond funds." Compl. ¶27. The actions of investors in the Oppenheimer Champion Income Fund—which Plaintiffs acknowledge

was a "clone" of the High Income Fund (Opp'n Br. at 2)—confirm this common sense point.

Much like the High Income Fund, the Champion Fund suffered an 80% decline during the financial panic that occurred in the fall of 2008. As early as February 12, 2009, investors in the Champion Fund were already filing complaints making essentially the same allegations as Plaintiffs make here. *See, e.g.,* Ex. 1, Complaint, *Estner v. OppenheimerFunds, Inc.*, Civil Action No. 09-1237 (S.D.N.Y.). Indeed, by early April 2009, *six* putative class actions had been filed by Champion Fund investors, and numerous others had filed motions to be lead plaintiffs in those actions. Moreover, other Champion Fund investors had initiated arbitrations against OFDI, including an arbitration filed by Plaintiffs' counsel. *See* Opening Br. at 11 n.4. Of course, these investors filed their claims despite the alleged misrepresentations Plaintiffs list on page 9 of their brief because, as discussed above, the Fund's 80% decline and full disclosure of its investments in swaps and MBS put the investors on notice of their claims. Thus, well more than three years before Plaintiffs filed this lawsuit, literally *dozens* of other investors—who had access to the same information as Plaintiffs—were already pursuing essentially the same claims that Plaintiffs belatedly are trying to raise now.

Plaintiffs do not and cannot dispute these facts. Instead, they argue that these suits are irrelevant because Plaintiffs might not have known about them. *See* Opp'n Br. at 8-9. Plaintiffs miss the point entirely—these lawsuits are directly relevant not because

6

Plaintiffs may or may not have known about them, but rather because they illustrate what reasonable investors actually understand from the fact that their purportedly "safe" and "conservative" investment has fallen by 80%. Plaintiffs do not and cannot explain why they did nothing for over three years while numerous other individual investors were filing lawsuits. Thus, Plaintiffs' claims are time barred and should be dismissed with prejudice.[1]

## II.    PLAINTIFFS' HOLDER CLAIMS CANNOT PROCEED.

Plaintiffs admit that they are attempting to bring "holder" claims. *See* Opp'n Br. at 4, 2 (acknowledging that Plaintiffs invested in the Fund in 2000 and that the allegedly misleading statements did not begin until 2006). As Defendants explained in their Opening Brief, the overwhelming majority of states that have addressed the question and the United States Supreme Court have rejected holder claims. *See* Opening Br. at 12-13 & n.5. Plaintiffs do not and cannot cite even one Colorado state court case suggesting that Colorado would adopt a different view. Accordingly, this Court should find that Colorado would follow the majority rule rejecting holder claims.

---

[1]    Plaintiffs also suggest that the statute of limitations issue should not be decided on a motion to dismiss. *See* Opp'n Br. at 6-7. The Supreme Court, however, has made clear that affirmative defenses such as the statute of limitations are appropriate grounds for a 12(b)(6) dismissal where they can be adjudicated on the basis of the complaint and judicially noticeable facts. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Grubka v. WebAccess Int'l, Inc.*, 445 F.Supp. 2d 1259, 1267 (D. Colo. 2006) (dismissing federal securities fraud claims); *Obeidat v. Chatila*, No. 10-02819, 2011 WL 2729067, at *3 (D. Colo. July 13, 2011) (dismissing common law fraud claims). This is just such a case.

Rather than cite any Colorado state court cases, Plaintiffs rely on one federal case—*Agile Safety Variable Fund, L.P. v. RBS Citizens, N.A.*, 793 F.Supp. 2d 1248 (D. Colo. 2011)—that allowed a holder claim under the Colorado Securities Act ("CSA"). *See* Opp'n Br. at 11.[2]  To begin with, Plaintiffs have not asserted any claims under the CSA, and they provide no support for the proposition that *Agile* should be extended to other causes of action.  Moreover, Plaintiffs have not come close to meeting the stringent pleading standard that the *Agile* court applied to the holder claim.

In *Agile*, the plaintiff purchased a limited partnership in a private investment fund. *Agile*, 793 F. Supp. 2d at 1251.  Several years later, the plaintiff seriously considered selling the investment, but was convinced not to sell—and, indeed, increased its investment by continuing to reinvest dividends—based on conversations it had with the fund's administrator and bank. When the fund turned out to be a Ponzi scheme, the plaintiff sued the fund's administrator and bank, alleging that the administrator and bank had made false representations about their due diligence and monitoring of the fund, and that the plaintiff had relied on these misrepresentations when it decided not to redeem its shares and to reinvest its dividends.  *Id*. at 1259.

---

[2]     Plaintiffs also note that the *Agile* court cited to *COPIC Ins. Co. v. Wells Fargo Bank, N.A.*, 767 F.Supp. 2d 1191 (D. Colo. 2011).  But the court in *COPIC* applied Minnesota law.  *Id.* at 1205.  Furthermore, like in *Agile*, in *COPIC* the plaintiff alleged that it attempted to redeem its investment at a specific time, and was dissuaded from doing so by the defendant's misrepresentations.  *Id.* at 1211.  And as in *Agile*, there were "direct communication and representations between the shareholder and the person making the misrepresentations."  *Id.*

Even though the plaintiff made its initial investment in the fund prior to its interactions with the defendants, the court allowed the plaintiff's suit to go forward because the plaintiff had "affirmatively allege[d]" concrete facts demonstrating that (1) it had a clear intention to sell; and (2) changed its mind only as "a direct result" of specific, identifiable communications that it had with representatives of the defendants. *Id.* at 1259. Based on these clear, precise, and concrete allegations, the court concluded that the policy concerns underlying the general rule against holder actions were not present:

> Similarly, quite distinct from cases involving publicly-traded shares, here there were ***direct communications and representations between the shareholder and the persons allegedly making the misrepresentations*** and other inducements. This means that the evidence is ***not simply a speculative, retrospective analysis of what a shareholder 'would have done.'*** Rather, the evidence here could persuade a reasonable jury that [the plaintiff] had every intention to redeem its [ ] investments in early 2007, but not only was dissuaded from doing so by Defendants' affirmative misrepresentations, it was in fact also ***induced to increase its exposure in [the fund] going forward*** through reinvestment of its monthly returns. On the record before it, the Court concludes that the holder doctrine does not bar [the plaintiff's] claim under the Colorado Securities Act.

*Id.* at 1259-60 (emphases added).[3]

---

[3]    As this passage makes clear, the *Agile* Court relied on the specific, concrete allegations in the plaintiff's complaint. Thus, Plaintiffs are simply wrong when they assert that the *Agile* ruling somehow created an broad exception to the holder doctrine for open-end funds. *See* Opp'n Br. at 12. Moreover, the fact that the plaintiff in *Agile* had invested in a fund was relevant to the Court's holder analysis because investments in that fund could only be sold through direct communication with the fund. *See Agile*, 793 F.Supp. 2d at 1259. Here, by contrast, the Fund's prospectus makes clear that Plaintiffs did *not* have to communicate directly with the Fund before selling their shares. *See* April 2008 Prospectus at 14. Thus, Plaintiffs' inaccurate assertion to the contrary (*see* Opp'n Br. at 11-12) should be disregarded.

Thus, the *Agile* court appears to have adopted the minority view that holder claims can proceed if—but *only* if—the plaintiff alleges "actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations." *Small v. Fritz Cos.*, 65 P.3d 1255, 1265 (Cal. 2003). As Defendants explained in their Opening Brief, this is a stringent standard that requires concrete factual allegations supporting a finding that the plaintiff had definite plans to sell her securities, but ultimately decided not to do so based on specific, direct communications from the defendants. *See* Opening Br. at 14; *Ohanessian v. Pusey*, No. 09-01113, 2010 WL 728549, at *1 (D. Colo. Feb. 25, 2010).

Plaintiffs do not come close to meeting this standard. *See* Opening Br. at 14-15. Specifically, they do not allege that they ever had any firm intention to sell their Fund shares, and they do not identify any specific and direct communication from Defendants that caused them to change their mind and to hold their shares. Accordingly, even assuming Colorado would adopt the minority view that holder claims are viable in certain limited circumstances, Plaintiffs' claims would still fail.

## III.   PLAINTIFFS FAIL TO PLEAD RELIANCE.

### A.   Plaintiffs Must Plead Reliance With Particularity.

Reliance is an essential element of all of Plaintiffs' misrepresentation claims. *See* Opening Br. at 15. Moreover, Plaintiffs do not dispute that all of their misrepresentation claims are based on the same facts as are their fraud claims. Thus, under well-settled law, they must plead the reliance element of all of their claims with particularity under

Rule 9(b).  *See* Opening Br. at 15; *Gunningham v. Standard Fire Ins. Co.*, No. 07-02538, 2008 WL 4377451, at *2 (D. Colo. Sept. 18, 2008); *Van Leeuwan v. Nuzzi*,  810 F. Supp. 1120, 1123 (D. Colo. 1993).

Plaintiffs' attempts to evade Rule 9(b) with respect to their negligent misrepresentation and CCPA claims misconstrue the cases upon which Plaintiffs purport to rely.  For example, in *Denver Health & Hospital Authority v. Beverage Distributors Co., LLC.*, 843 F.Supp. 2d 1171 (D. Colo. 2012)—which Plaintiffs assert holds that negligent misrepresentation claims are never subject to Rule 9(b), *see* Opp'n Br. at 13— the court held only that Rule 9(b) did not apply to the "***particular*** negligent misrepresentation claim" at issue in that case because "the crux of the claim is that the [defendant] failed to use reasonable care or competence" and "***none of the causes of action or allegations implicate fraud***."  *Id*. at 1177-79 (emphasis added).  In contrast, the court acknowledged that Rule 9(b) ***does*** apply where, as here, "the negligent misrepresentation claim is based on the same set of facts as a fraud claim."  *Id*. at 1178 (*citing Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003)) (internal quotations omitted).[4]  Thus, *Denver Health* actually rejects the very argument Plaintiffs are attempting to make here.

---

[4]      Plaintiffs also cited *Conrad v. Educ. Res. Inst.*, 652 F.Supp. 2d 1172, 1183 (D. Colo. 2009), but that case failed to address the numerous precedents holding that negligent misrepresentation claims are subject to Rule 9(b) when they are based on the same facts as a fraud claim.  Notably, the *Conrad* Court dismissed the negligent misrepresentation claim on statute of limitations grounds.

Similarly, Plaintiffs simply assert—without being able to cite ***even one*** case in support—that their CCPA claims are exempt from Rule 9(b). *See* Opp'n Br. at 16. Simply put, Plaintiffs are wrong, as every decision in this District has clearly held by applying Rule 9(b) to CCPA claims. *See, e.g., HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F.Supp. 2d 1115, 1120-21 (D. Colo. 2011); *Hanson v. Auto-Owners Ins. Co.*, No. 09-02736, 2010 WL 749820, at *2 (D. Colo. Mar. 4, 2010); *Duran v. Clover Club Foods Co.*, 616 F.Supp. 790, 793 (D. Colo. 1985). Indeed, in *Hanson*, the court applied Rule 9(b) to a claim under subsection (u) of the CCPA, C.R.S. § 6-1-105, which is one of the subsections that Plaintiffs are claiming should be entirely exempt from Rule 9(b). *See* Opp'n Br. at 15.

**B.      Plaintiffs Fail to Plead Reliance Adequately.**

Plaintiffs wholly fail to plead reliance with the particularity required by Rule 9(b). Indeed, their allegations are so meager that they fail even to meet the *Twombly/Iqbal* standard that applies under Rule 8(a). Specifically, Plaintiffs never say that they actually read the allegedly misleading Fund prospectuses. *See* Opening Br. at 16; Opp'n Br. at 18. Instead, the best they can come up with is the assertion that they were "unaware" of the Fund's purported "change of strategy" in 2006. Opp'n Br. at 18. This bare-bones allegation of ignorance does not come close to an allegation of actual reliance, and Plaintiffs do not seriously contend otherwise.

Instead, Plaintiffs assert that they do not have to plead reliance because their claims purportedly rely on omissions rather than affirmative misrepresentations. *See* Opp'n Br. at 17-18. To begin with, on the facts of this case, Colorado courts would not apply the so-called *Affiliated Ute* presumption upon which Plaintiffs seek to rely. For example, the Colorado Supreme Court has held that *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), is "totally inapplicable" to a situation where the plaintiff is alleging misrepresentations in a document, as opposed to the types of personal interactions based on a "relationship of trust and confidence" that were at issue in *Affiliated Ute*. *See Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1103 (Colo. 1995). Likewise, in a CCPA case, the Colorado Court of Appeals expressly rejected *Affiliated Ute* and stated: "We reject the notion that there is any Colorado precedent for a theory of presumed reliance." *Garcia v. Medved Chevrolet, Inc.*, 240 P.3d 371, 380 (Colo. App. 2009), *aff'd*, 263 P.3d 92 (Colo. 2011). Plaintiffs do not and cannot cite *any* Colorado cases to the contrary. *See* Opp'n Br. at 17.

Moreover, even assuming Colorado would adopt the *Affiliated Ute* presumption as it has been applied in other jurisdictions, Plaintiffs' claims would still fail for two reasons. First, the presumption applies *only* when the complaint is actually based primarily on omissions, rather than on misrepresentations of material fact. *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1162-63 (10th Cir. 2000) (applying federal law). At its core, however, Plaintiffs' Complaint asserts that, in light of the Fund's aggressive

investment strategies, the Fund's prospectuses from 2006 through 2008 affirmatively

misrepresented the Fund's overall risk profile:

- "OFI and OFDI *substantially misrepresented* the highly speculative nature of the High Income Fund." Compl. ¶ 20 (emphasis added).

- "The risks of this Fund were *materially misrepresented* to the investing public . . . ." *Id.* (emphasis added).

- The Defendants allegedly falsely "*portrayed* the High Income Fund and the Champion Income Fund to be conservative or safe bond funds." *Id.* ¶ 27 (emphasis added).

- The Defendants allegedly falsely "*portrayed* high-yield fixed-income mutual funds to be relatively safe to the investing public." *Id.* ¶ 28 (emphasis added)

- "The High Income Fund was anything but safe, and *any representations to the contrary made by the Defendants were false*." *Id.* ¶ 29 (emphasis added).

- "The *representations* made by the Defendants were *false and misleading* for a number of reasons . . . ." *Id.* ¶ 31.

Because this case is fundamentally about misrepresentations, the *Affiliated Ute*

presumption simply does not apply, even assuming Colorado would adopt it.

Second, *Affiliated Ute* also does not apply because Plaintiffs do not—and

apparently cannot—allege that they ever read the allegedly misleading prospectuses.

Underlying *Affiliated Ute* is the notion that an omission could injure a plaintiff if

knowing the omitted information would have caused her to act differently. *See, e.g.,*

*Mirkin v. Wasserman*, 5 Cal.4th 1082, 1091, 858 P.2d 568, 574 (1993) (explaining that to

prove causation based on an omission, a plaintiff must "prove that, had the omitted

information been disclosed, one would have been aware of it and behaved differently").

But if a plaintiff did not read the document that purportedly omitted material information, then the omissions could not have caused the plaintiff any injury, because she would not have been aware of the information even if it had been disclosed, and thus would not have acted differently.  That is why plaintiffs attempting to invoke *Affiliated Ute* based on purported omissions from a document must allege that they actually read the document:

- "[I]f in making their purchasing"—or, in this case, "holding"—"decisions plaintiffs . . . did not actually rely on the 1988 official statement, then the *Affiliated Ute* presumption will not apply."  *Alter v. DBLM, Inc.*, 840 F. Supp. 799, 807 (D. Colo. 1993).

- Where the plaintiff did not rely on the document that purportedly omitted information, "nondisclosure cannot be said to be the cause of the subsequent loss." *Edgington v. R.G. Dickinson & Co.*, 139 F.R.D. 183, 192 (D. Kan. 1991).

- *Affiliated Ute* did not apply where the plaintiff did not read the marketing materials that allegedly omitted material information.  *Fishman v. Morgan Keegan & Co.*, No. 10-2, 2011 WL 4853367, at *6 (E.D. La. Oct. 13, 2011).

As discussed above, Plaintiffs do not—and apparently cannot—allege that they actually read any of the allegedly misleading prospectuses.  Accordingly, they cannot invoke *Affiliated Ute* and, therefore, have not adequately pled reliance.

## IV.    THE CCPA DOES NOT APPLY TO PLAINTIFFS' CLAIMS.

### A.    The CCPA Is Inapplicable Because Plaintiffs Are Utah Residents Who Purchased Their Variable Insurance Policies in Utah.

Plaintiffs concede that:  (1) they are Utah residents; (2) they invested in the Fund based on the recommendation of a Salt Lake City-based investment advisor; (3) they

received the alleged misrepresentations in Utah; and (4) any alleged reliance on their part would have occurred in Utah.  *See* Opp'n Br. at 20.  Thus, as this court held in *Elvig v. Nintendo of America, Inc.*, 696 F. Supp. 2d 1207, 1215 (D. Colo. 2010), the consumer-protection laws of the State of Utah, *not* the CCPA, apply to Plaintiffs' claims.

Plaintiffs attempt to argue otherwise only by ignoring the most fundamental aspect of *Elvig*'s reasoning—that applying Colorado's consumer protection law to the residents of other states would both "subvert the ability of [a home] state[] to protect its citizens and regulate those who offer products or services to its citizens" and "defeat reasonable expectations of [] purchasers," who "expect to be protected by the laws applicable to the state where they live, purchase a product and use it."  *Id.* at 1213-15.  Similarly, Plaintiffs miss the point when they cite to a transfer motion that the Defendants filed in another action.  *See* Opp'n Br. at 20.  Defendants do not dispute that they have ties to the State of Colorado, but, as the *Elvig* court recognized, the relevant question in a choice-of-law dispute involving ***consumer protection statutes*** is where ***the consumer*** is located.  *See, e.g., Agostini v. Quest Diagnostics, Inc.*, 256 F.R.D. 437, 462-63 (D.N.J. 2009) (holding that, under Section 148 of the Restatement (Second) of Conflict of Laws, the consumer protection laws of a plaintiff's home state should apply); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008) (same); *In re Pharm. Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) (same).[5]

---

[5]      Notably, Plaintiffs urge the Court to apply Section 148 of the Restatement, but do not cite a single case that actually applies that section.  *See* Opp'n Br. at 20.  They ignore the law

Because Plaintiffs concede that all their ties are to the State of Utah, that state's consumer protection laws apply to their claims.

## B.   The CCPA Does Not Apply To Securities Transactions.

Plaintiffs' CCPA claim also should be dismissed because the CCPA does not apply to securities transactions.  Plaintiffs cannot point to a single instance where a Colorado court applied the CCPA to a securities transaction.  Nevertheless, they argue that the Colorado Supreme Court's decision in *Showpiece Homes Corp. v. Assurance*, 38 P.3d 47 (Colo. 2001)—a case that had nothing to do with securities transactions[6]— suggests that they may assert CCPA claims.  *See* Opp'n Br. at 21-22.  In *Showpiece Homes*, the court held that the CCPA was not preempted by the Colorado Unfair Claims – Deceptive Practices Act ("UCDPA"), which gives the Insurance Commissioner the power to investigate certain practices of insurers and to enforce regulatory penalties, but provides no private right of action.  *Id*. at 49.  The court stated that the "mere existence of a regulatory body to oversee certain standards of an industry does not remove all acts and

---

because, as the cases cited in this brief make clear, courts applying Section 148 have overwhelmingly applied the law of the state where the plaintiff resides and purportedly relied on the allegedly misleading statement.

[6]    *Showpiece Homes* involved the sale of insurance.  Plaintiffs vaguely attempt to link this case to insurance by noting that Plaintiffs invested in the Fund through variable life insurance policies.  *See* Opp'n Br. at 22.  Plaintiffs, however, are not suing the seller of their variable insurance policies.  Rather, they are suing the investment adviser and distributor of the mutual fund in which Plaintiffs chose to invest the assets of their variable insurance policies.  Thus, contrary to Plaintiffs' suggestions, *Showpiece Homes* is not even in the same neighborhood as this case.

practices of that industry from the provisions of the CCPA." *Id*. at 56-57.  Rather than

conflicting with one another, the UCDPA and CCPA "achieve different but

complementary results" – the UCDPA provides regulatory enforcement and the CCPA

provides a private remedy.  *Id*. at 53.

Showpiece Homes* is easily distinguishable.  To begin with, unlike the insurance

statute at issue in *Showpiece Homes*, the CSA specifically prohibits—and provides a

private right of action for—deceptive trade practices in connection with securities

transactions.  *See* C.R.S. § 11-51-501.  Thus, the CSA should apply here because, under

Colorado law, when two statutes attempt to regulate the same conduct, the more specific

statute preempts the general statute.  *See Crowe v. Tull*, 126 P.3d 196, 206 (Colo. 2006);

*City of Aspen v. Kinder Morgan, Inc.*, 143 P.3d 1076, 1080 (Colo. App. 2006).

Moreover, rather than being "complementary" to the CSA, the CCPA conflicts with it.

Specifically, the CSA provides that no claim can be brought "more than five years after

the purchase or sale of the security."  *See* C.R.S. § 11-51-604(8).  This statute of

repose—an integral part of the CSA's carefully crafted remedial scheme—would be

eviscerated if investors such as Plaintiffs were allowed to bring their time-barred claims

under the CCPA instead.

## V.    PLAINTIFFS' NEGLIGENT SUPERVISION CLAIM IS DERIVATIVE.

Plaintiffs do not dispute that they had no contract with OFI or OFDI.  Instead, OFI

had a contract **with the Fund** to invest the assets of the Fund.  *See* Opening Br. at 20.

Thus, if OFI breached that contract by negligently managing the Fund's assets as Plaintiffs contend, any negligence or breach of contract claim would belong **to the Fund**. *See* Opening Br. at 20 (collecting cases).  That is why Plaintiffs do not and cannot cite even one case that allows a mutual fund shareholder to sue the fund's manager directly for negligent management of Fund assets.  *See* Opp'n Br. at 23.  And that is why these types of mismanagement claims were brought derivatively against the Champion Fund, rather than as direct claims, in the Champion Fund securities class action.  *See* Ex. 2, Complaint, *Bohus v. Angelo Manioudakis, et al.*, Civil Action No. 10-cv-01473 (asserting derivative claims).  Because Plaintiffs have no direct claim for negligent supervision and they have not even attempted to meet any of the requirements for bringing a derivative claim, their negligent supervision claim should be dismissed.

## VI.    THE FUND DID NOT MAKE ANY MATERIAL MISREPRESENTATIONS

Plaintiffs' claims focus on the Fund's investments in swaps and MBS.  But Plaintiffs do not and cannot dispute that the Fund disclosed:

- it could invest in swaps and MBS;

- the principal risks of swaps and MBS; and

- detailed information about each MBS and each swap it held.

*See* Opening Br. at 8, 21-22, 30-36.  Thus, Plaintiffs have no choice but to retreat to the argument that the Fund's prospectuses allegedly were misleading because they failed to warn investors about the "magnitude" of the losses that the Fund eventually suffered.  *See* Opp'n Br. at 25, 28.

At bottom, this is nothing more than a claim that the Fund failed to **predict and disclose in advance** how its investments would perform during a financial crisis.  The future is unknowable, and nobody has perfect foresight.  That is why investors **cannot** state a claim based on nothing more than a failure to accurately predict and disclose future events or how an investment will perform.  Instead, investors must identify a concrete, hard **fact** whose omission made other statements materially misleading.

For example, in *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185 (N.D. Ill. June 23, 1994), the fund warned investors that the devaluation of foreign currencies could cause the fund to suffer losses.  When investors later sued the fund, alleging that it failed to disclose "the magnitude of the risk" of the devaluations, the court dismissed the claim, explaining:

> **Nor can investors state a claim for omission of material information where the offeror fails to quantify the risks identified.** . . . [Defendant] was not under a duty to quantify the risk . . . [T]he Seventh Circuit [has] stressed the importance of making disclosures, because '**disclosures assist investors in determining the magnitude of the risk**.'  [The Seventh Circuit] did not place the burden of quantifying risks on the offeror of securities. Thus, the failure to quantify the risk of devaluation is not an actionable omission.

*Id*. at *2 (emphasis added); *see also RAC Mortgage Investment Corp. Sec. Litig.*, 765 F.Supp. 860, 864 (D. Md. 1991) (rejecting claimed failure to disclose the "magnitude" of alleged risks, because "prospectuses need not characterize a security or a risk").

Indeed, even the cases upon which Plaintiffs rely illustrate the point.  In *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL

300733 (S.D.N.Y. Mar. 28, 2001), the defendant sold annuity-like products and invested the sale proceeds. The defendant disclosed that its customers could surrender their annuities in return for payment of their principal, which could create liquidity problems if the issuer invested the sale proceeds in long-term securities. *Id*. at *2. The issuer stated that it was hedging this risk by investing the proceeds of the sales in "securities of shorter duration . . . than the Company's other investment portfolios." *Id*. The issuer failed, however, to disclose the ***fact*** that its customers could demand payment on the annuities with as little as seven days notice. The nondisclosure of that additional ***fact***, the court explained, might have rendered misleading the suggestion that the company had adequately hedged the liquidity risk by investing in a portfolio of "shorter duration." *Id*. at *9. Thus, as the very sentence that Plaintiffs quote makes clear, *Credit Suisse* merely held that issuers must disclose "***hard facts*** critical to appreciating the magnitude of the risks described." *See* Opp'n Br at 25 (emphasis added).[7]

Although Plaintiffs repeatedly invoke the buzzword "magnitude," they struggle mightily to identify ***any*** "hard facts" about swaps and MBS that the Fund allegedly failed

---

[7]    Plaintiffs also cite *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1997). That case, however, involved an alleged failure to disclose a risk altogether. Plaintiffs do not allege that the Funds failed to disclose any risks. Rather, they claim the Funds failed to characterize the magnitude of disclosed risks. Here, the Fund disclosed the very risk that was at issue in *Rodney*: "When interest rates rise rapidly, and if prepayments occur more slowly than expected, a short- or medium-term CMO can in effect become a long-term security, subject to greater fluctuation in value." April 2008 Prospectus at 9.

to disclose.  Indeed, Plaintiffs appear to rely on just two alleged omissions, neither of which comes close to stating a claim:

*First*, Plaintiffs appear to assert that the Fund wrongly failed to disclose the total notional amount of all of its swaps.  *See* Opp'n Br. at 29-30.  To begin with, Plaintiffs point to no rule, regulation, or statute that requires a mutual fund to disclose this particular number.  Instead, they appear to have invented this purported obligation solely for the purpose of filing this lawsuit.  But in any event, it is undisputed that the Fund disclosed the notional value of each of its swaps.  *See* Opening Br. at 8, 34.  Thus, as Plaintiffs concede, any investor who cared about the total notional value could have calculated it simply by "add[ing] . . . numbers together."  Opp'n Br. at 30.  Plaintiffs' position, therefore, boils down to the bizarre argument that reasonable investors are sophisticated enough to interpret and make decisions based on the total notional value of a Fund's swaps, but are not capable of adding up a column of numbers.  As numerous courts have held, fanciful arguments like these fail to state a claim and should be dismissed.  *See, e.g., Werner v. Werner*, 267 F.3d 288, 300 (3d Cir. 2001) (omission not material where shareholders had all the information necessary to calculate the omitted data point themselves); *Trump v. Field*, 850 F.2d 938, 949 (2d Cir. 1988) ("failure to perform . . . calculation for investors" does not materially alter the total mix of

information); *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1344 (8th Cir. 1980)

(holding that a reasonable investor can be expected to perform "simple arithmetic").[8]

    *Second*, Plaintiffs alleged that the Fund failed to disclose the "tranches" of its

MBS investments.  Compl. ¶ 31(f).  Once again, however, Plaintiffs point to no SEC rule

or regulation that requires a mutual fund to disclose this level of detail about each of its

investments.  Moreover, Plaintiffs now concede that their allegation is false because the

Fund did disclose the precise tranches in which the Fund invested.  *See* Opening Br. at

36 n.19; Opp'n Br. at 31.  But, in an attempt to salvage their claim, Plaintiffs assert that

even this level of detail is not enough.  *See* Opp'n Br. at 31-32.  Plaintiffs' refusal to drop

this claim even after their allegations have been proven false demonstrates more about

them and their claims than it does about the Fund's disclosures—no matter what the Fund

had disclosed, Plaintiffs would have, in hindsight, found some purported flaw or some

other detail that could have been disclosed.  As Defendants explained in their Opening

Brief, the Fund disclosed the truly material risks of MBS and the material facts about the

---

[8]    The cases cited by Plaintiffs on this issue are easily distinguishable.  In *SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009), the relevant numerical disclosures were included in *different* documents filed by *different* issuers, *i.e.*, the documents that contained the relevant information were not sent to the investors or even issued by the company in which they invested.  That is why the court concluded that the information was not "readily available" to the issuer's investors.  *See id*. at *10.  And in *In re Real Estate Associates Ltd. Partnership Litigation*, 223 F.Supp. 2d 1109 (C.D. Cal. 2003), the court concluded that the calculations necessary to understand the disclosures were *not* calculations that "could easily be made" and were not "obvious to anyone conversant in basic mathematics."  *Id*. at 1132.  Here, by contrast, even Plaintiffs have conceded that basic arithmetic is all that is required.

Fund's MBS investments. Accordingly, Plaintiffs' claims about the Fund's MBS investment should be dismissed.

Plaintiffs' remaining disclosure arguments simply regurgitate the allegations of the Complaint. Defendants' Opening Brief explains why each of these claims fail. *See* Opening Br. at 20-39.[9]

## CONCLUSION

For the reasons explained above and in Defendants' Opening Brief, Defendants respectfully request that the Court dismiss the Complaint, with prejudice.

---

[9] Even though they cite no authority in support of their argument, Plaintiffs chide Defendants for not citing authority for the statement that the Fund has wide discretion to define the term "industry." *See* Opp'n Br. at 32. This point, however, is well-settled. *See, e.g., In re Charles Schwab Corp. Sec. Litig.*, No. 08-01510, 2010 WL 1261705, at *6 (N.D. Cal. Mar. 30, 2010) (explaining that a mutual fund "is free to define an industry in any reasonable way").

Respectfully submitted this 26th day of October, 2012.

Respectfully submitted,

*s/Lino S. Lipinsky de Orlov*
Lino S. Lipinsky de Orlov
McKenna Long & Aldridge LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone: (303) 634-4000
Facsimile: (303) 634-4400
Email: llipinsky@mckennalong.com


*s/Michael Scott Doluisio*
Michael Scott Doluisio
Dechert, LLP – Philadelphia
2929 Arch Street
Cira Centre
Philadelphia, PA 19104-2808
Telephone: (215) 994-2325
Facsimile: (215) 994-2222
Email: Michael.doluisio@dechert.com


ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of October, 2012, a true and correct copy of the foregoing **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS** was electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following:

> David Neuman, Esq.
> Stoltman Law Offices, P.C.
> 10 S. LaSalle Street, Suite 3500
> Chicago, IL 60603
> *daveneuman@stoltlaw.com*

> *s/Lisa King*
> Lisa King

DN:32235016.3